# MORAN, SUPERINTENDENT, RHODE ISLAND DEPARTMENT OF CORRECTIONS v. BURBINE

No. 84-1485.   Argued November 13, 1985—Decided March 10, 1986

414

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BRENNAN and MAR-SHALL, JJ., joined, *post*, p. 434.

*Constance L. Messore,* Special Assistant Attorney General of Rhode Island, argued the cause for petitioner. With her on the briefs was *Arlene Violet,* Attorney General.

*Deputy Solicitor General Frey* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Acting Solicitor General Fried, Assistant Attorney General Trott, Andrew J. Pincus,* and *Sara Criscitelli.*

*Robert B. Mann* argued the cause for respondent. With him on the brief was *William F. Reilly.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of California et al. by *John K. Van de Kamp,* Attorney General of California, *Steve White,* Chief Assistant Attorney General, *Karl S. Mayer,* Assistant Attorney General, and *Ann K. Jensen* and *Dane R. Gillette,* Deputy Attorneys General, *Charles A. Graddick,* Attorney General of Alabama, *Norman C. Gorsuch,* Attorney General of Alaska, *Robert K. Corbin,* Attorney General of Arizona, *Duane Woodard,* Attorney General of Colorado, *Austin J. McGuigan,* Chief State's Attorney of Connecticut, *Charles M. Oberly III,* Attorney General of Delaware, *Neil F. Hartigan,* Attorney General

JUSTICE O'CONNOR delivered the opinion of the Court.

After being informed of his rights pursuant to *Miranda* v. *Arizona*, 384 U. S. 436 (1966), and after executing a series of written waivers, respondent confessed to the murder of a young woman. At no point during the course of the interrogation, which occurred prior to arraignment, did he request an attorney. While he was in police custody, his sister attempted to retain a lawyer to represent him. The attorney telephoned the police station and received assurances that respondent would not be questioned further until the next day. In fact, the interrogation session that yielded the inculpatory statements began later that evening. The question presented is whether either the conduct of the police or respond-

---

of Illinois, *Linley E. Pearson*, Attorney General of Indiana, *Robert T. Stephan*, Attorney General of Kansas, *William J. Guste, Jr.*, Attorney General of Louisiana, *James E. Tierney*, Attorney General of Maine, *Stephen H. Sachs*, Attorney General of Maryland, *Stanley D. Steinborn*, Attorney General of Michigan, *William L. Webster*, Attorney General of Missouri, *Mike Greeley*, Attorney General of Montana, *Stephen E. Merrill*, Attorney General of New Hampshire, *Irwin I. Kimmelman*, Attorney General of New Jersey, *Lacy H. Thornburg*, Attorney General of North Carolina, *Nicholas J. Spaeth*, Attorney General of North Dakota, *Leroy S. Zimmerman*, Attorney General of Pennsylvania, *Travis Medlock*, Attorney General of South Carolina, *Mark V. Meierhenry*, Attorney General of South Dakota, *W. J. Michael Cody*, Attorney General of Tennessee, *Jim Mattox*, Attorney General of Texas, *Gerald L. Baliles*, Attorney General of Virginia, *Jeffrey L. Amestoy*, Attorney General of Vermont, *Charlie Brown*, Attorney General of West Virginia, *Bronson C. La Follette*, Attorney General of Wisconsin, *A. G. McClintock*, Attorney General of Wyoming, *Richard G. Opper*, Attorney General of Guam, *J'Ada M. Finch-Sheen*, Attorney General of the Virgin Islands, and *Jack E. Yelverton;* and for Americans for Effective Law Enforcement, Inc., by *David Crump, Daniel B. Hales, Fred E. Inbau, Wayne W. Schmidt,* and *James P. Manak*.

Briefs of *amici curiae* urging affirmance were filed for the American Bar Association by *William W. Falsgraf, Steven H. Goldblatt,* and *Charles G. Cole;* for the National Association of Criminal Defense Lawyers et al. by *Judith H. Mizner, Nancy Gertner,* and *Scott Baldwin;* and for the National Legal Aid and Defender Association et al. by *Kim R. Fawcett, James R. Neuhard, Jack D. Novik,* and *John A. MacFadyen*.

ent's ignorance of the attorney's efforts to reach him taints the validity of the waivers and therefore requires exclusion of the confessions.

## I

On the morning of March 3, 1977, Mary Jo Hickey was found unconscious in a factory parking lot in Providence, Rhode Island. Suffering from injuries to her skull apparently inflicted by a metal pipe found at the scene, she was rushed to a nearby hospital. Three weeks later she died from her wounds.

Several months after her death, the Cranston, Rhode Island, police arrested respondent and two others in connection with a local burglary. Shortly before the arrest, Detective Ferranti of the Cranston police force had learned from a confidential informant that the man responsible for Ms. Hickey's death lived at a certain address and went by the name of "Butch." Upon discovering that respondent lived at that address and was known by that name, Detective Ferranti informed respondent of his *Miranda* rights. When respondent refused to execute a written waiver, Detective Ferranti spoke separately with the two other suspects arrested on the breaking and entering charge and obtained statements further implicating respondent in Ms. Hickey's murder. At approximately 6 p.m., Detective Ferranti telephoned the police in Providence to convey the information he had uncovered. An hour later, three officers from that department arrived at the Cranston headquarters for the purpose of questioning respondent about the murder.

That same evening, at about 7:45 p.m., respondent's sister telephoned the Public Defender's Office to obtain legal assistance for her brother. Her sole concern was the breaking and entering charge, as she was unaware that respondent was then under suspicion for murder. She asked for Richard Casparian who had been scheduled to meet with respondent earlier that afternoon to discuss another charge unrelated to either the break-in or the murder. As soon as the conversa-

tion ended, the attorney who took the call attempted to reach Mr. Casparian. When those efforts were unsuccessful, she telephoned Allegra Munson, another Assistant Public Defender, and told her about respondent's arrest and his sister's subsequent request that the office represent him.

At 8:15 p.m., Ms. Munson telephoned the Cranston police station and asked that her call be transferred to the detective division. In the words of the Supreme Court of Rhode Island, whose factual findings we treat as presumptively correct, 28 U. S. C. § 2254(d), the conversation proceeded as follows:

> "A male voice responded with the word 'Detectives.' Ms. Munson identified herself and asked if Brian Burbine was being held; the person responded affirmatively. Ms. Munson explained to the person that Burbine was represented by attorney Casparian who was not available; she further stated that she would act as Burbine's legal counsel in the event that the police intended to place him in a lineup or question him. The unidentified person told Ms. Munson that the police would not be questioning Burbine or putting him in a lineup and that they were through with him for the night. Ms. Munson was not informed that the Providence Police were at the Cranston police station or that Burbine was a suspect in Mary's murder." *State* v. *Burbine*, 451 A. 2d 22, 23–24 (1982).

At all relevant times, respondent was unaware of his sister's efforts to retain counsel and of the fact and contents of Ms. Munson's telephone conversation.

Less than an hour later, the police brought respondent to an interrogation room and conducted the first of a series of interviews concerning the murder. Prior to each session, respondent was informed of his *Miranda* rights, and on three separate occasions he signed a written form acknowledging that he understood his right to the presence of an attorney and explicitly indicating that he "[did] not want an attorney

called or appointed for [him]" before he gave a statement. App. to Pet. for Cert. 94, 103, 107. Uncontradicted evidence at the suppression hearing indicated that at least twice during the course of the evening, respondent was left in a room where he had access to a telephone, which he apparently declined to use. Tr. of Suppression Hearing 23, 85. Eventually, respondent signed three written statements fully admitting to the murder.

Prior to trial, respondent moved to suppress the statements. The court denied the motion, finding that respondent had received the *Miranda* warnings and had "knowingly, intelligently, and voluntarily waived his privilege against self-incrimination [and] his right to counsel." App. to Pet. for Cert. 116. Rejecting the contrary testimony of the police, the court found that Ms. Munson did telephone the detective bureau on the evening in question, but concluded that "there was no . . . conspiracy or collusion on the part of the Cranston Police Department to secrete this defendant from his attorney." *Id.*, at 114. In any event, the court held, the constitutional right to request the presence of an attorney belongs solely to the defendant and may not be asserted by his lawyer. Because the evidence was clear that respondent never asked for the services of an attorney, the telephone call had no relevance to the validity of the waiver or the admissibility of the statements.

The jury found respondent guilty of murder in the first degree, and he appealed to the Supreme Court of Rhode Island. A divided court rejected his contention that the Fifth and Fourteenth Amendments to the Constitution required the suppression of the inculpatory statements and affirmed the conviction. Failure to inform respondent of Ms. Munson's efforts to represent him, the court held, did not undermine the validity of the waivers. "It hardly seems conceivable that the additional information that an attorney whom he did not know had called the police station would have added significantly to the quantum of information necessary for the

accused to make an informed decision as to waiver." *State* v. *Burbine* 451 A. 2d 22, 29 (1982). Nor, the court concluded, did *Miranda* v. *Arizona*, or any other decision of this Court independently require the police to honor Ms. Munson's request that interrogation not proceed in her absence. In reaching that conclusion, the court noted that because two different police departments were operating in the Cranston station house on the evening in question, the record supported the trial court's finding that there was no "conspiracy or collusion" to prevent Ms. Munson from seeing respondent. 451 A. 2d, at 30, n. 5. In any case, the court held, the right to the presence of counsel belongs solely to the accused and may not be asserted by "benign third parties, whether or not they happen to be attorneys." *Id.*, at 28.

After unsuccessfully petitioning the United States District Court for the District of Rhode Island for a writ of habeas corpus, 589 F. Supp. 1245 (1984), respondent appealed to the Court of Appeals for the First Circuit. That court reversed. 753 F. 2d 178 (1985). Finding it unnecessary to reach any arguments under the Sixth and Fourteenth Amendments, the court held that the police's conduct had fatally tainted respondent's "otherwise valid" waiver of his Fifth Amendment privilege against self-incrimination and right to counsel. *Id.*, at 184. The court reasoned that by failing to inform respondent that an attorney had called and that she had been assured that no questioning would take place until the next day, the police had deprived respondent of information crucial to his ability to waive his rights knowingly and intelligently. The court also found that the record would support "no other explanation for the refusal to tell Burbine of Attorney Munson's call than . . . deliberate or reckless irresponsibility." *Id.*, at 185. This kind of "blameworthy action by the police," the court concluded, together with respondent's ignorance of the telephone call, "vitiate[d] any claim that [the] waiver of counsel was knowing and voluntary." *Id.*, at 185, 187.

We granted certiorari to decide whether a prearraignment confession preceded by an otherwise valid waiver must be suppressed either because the police misinformed an inquiring attorney about their plans concerning the suspect or because they failed to inform the suspect of the attorney's efforts to reach him. 471 U. S. 1098 (1985). We now reverse.

## II

In *Miranda* v. *Arizona*, the Court recognized that custodial interrogations, by their very nature, generate "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U. S., at 467. To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused. In particular, prior to the initiation of questioning, they must fully apprise the suspect of the State's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires." *Id.*, at 468–470. Beyond this duty to inform, *Miranda* requires that the police respect the accused's decision to exercise the rights outlined in the warnings. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, [or if he] states that he wants an attorney, the interrogation must cease." *Id.*, at 473–474. See also *Edwards* v. *Arizona*, 451 U. S. 477 (1981).

Respondent does not dispute that the Providence police followed these procedures with precision. The record amply supports the state-court findings that the police administered the required warnings, sought to assure that respondent understood his rights, and obtained an express written waiver prior to eliciting each of the three statements. Nor does respondent contest the Rhode Island courts' determination that he at no point requested the presence of a lawyer.

He contends instead that the confessions must be suppressed because the police's failure to inform him of the attorney's telephone call deprived him of information essential to his ability to knowingly waive his Fifth Amendment rights. In the alternative, he suggests that to fully protect the Fifth Amendment values served by *Miranda,* we should extend that decision to condemn the conduct of the Providence police. We address each contention in turn.

## A

Echoing the standard first articulated in *Johnson* v. *Zerbst,* 304 U. S. 458, 464 (1938), *Miranda* holds that "[t]he defendant may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." 384 U. S., at 444, 475. The inquiry has two distinct dimensions. *Edwards* v. *Arizona, supra,* at 482; *Brewer* v. *Williams,* 430 U. S. 387, 404 (1977). First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. *Fare* v. *Michael C.,* 442 U. S. 707, 725 (1979). See also *North Carolina* v. *Butler,* 441 U. S. 369, 374–375 (1979).

Under this standard, we have no doubt that respondent validly waived his right to remain silent and to the presence of counsel. The voluntariness of the waiver is not at issue. As the Court of Appeals correctly acknowledged, the record is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements. 753 F. 2d, at 184. Indeed it appears that it was respondent, and not the

police, who spontaneously initiated the conversation that led to the first and most damaging confession. *Id.*, at 180. Cf. *Edwards* v. *Arizona, supra.* Nor is there any question about respondent's comprehension of the full panoply of rights set out in the *Miranda* warnings and of the potential consequences of a decision to relinquish them. Nonetheless, the Court of Appeals believed that the "[d]eliberate or reckless" conduct of the police, in particular their failure to inform respondent of the telephone call, fatally undermined the validity of the otherwise proper waiver. 753 F. 2d, at 187. We find this conclusion untenable as a matter of both logic and precedent.

Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right. Under the analysis of the Court of Appeals, the same defendant, armed with the same information and confronted with precisely the same police conduct, would have knowingly waived his *Miranda* rights had a lawyer not telephoned the police station to inquire about his status. Nothing in any of our waiver decisions or in our understanding of the essential components of a valid waiver requires so incongruous a result. No doubt the additional information would have been useful to respondent; perhaps even it might have affected his decision to confess. But we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights. See, *e. g., Oregon* v. *Elstad,* 470 U. S. 298, 316–317 (1985); *United States* v. *Washington,* 431 U. S. 181, 188 (1977). Cf. *Hill* v. *Lockhart,* 474 U. S. 52, 56 (1985); *McMann* v. *Richardson,* 397 U. S. 759, 769 (1970). Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis

is complete and the waiver is valid as a matter of law.[1]  The Court of Appeals' conclusion to the contrary was in error.

Nor do we believe that the level of the police's culpability in failing to inform respondent of the telephone call has any bearing on the validity of the waivers.  In light of the state-court findings that there was no "conspiracy or collusion" on the part of the police, 451 A. 2d, at 30, n. 5, we have serious doubts about whether the Court of Appeals was free to conclude that their conduct constituted "deliberate or reckless irresponsibility."  753 F. 2d, at 185; see 28 U. S. C. § 2254(d). But whether intentional or inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights. Although highly inappropriate, even deliberate deception of an attorney could not possibly affect a suspect's decision to waive his *Miranda* rights unless he were at least aware of the incident.  Compare *Escobedo* v. *Illinois*, 378 U. S. 478, 481 (1964) (excluding confession where police incorrectly told the *suspect* that his lawyer "'didn't want to see' him").  Nor was the failure to inform respondent of the telephone call the kind of "trick[ery]" that can vitiate the validity of a waiver. *Miranda*, 384 U. S., at 476.  Granting that the "deliberate or reckless" withholding of information is objectionable as a

[1] The dissent incorrectly reads our analysis of the components of a valid waiver to be inconsistent with the Court's holding in *Edwards* v. *Arizona*, 451 U. S. 477 (1981).  *Post*, at 452.  When a suspect *has* requested counsel, the interrogation must cease, regardless of any question of waiver, unless the suspect himself initiates the conversation.  In the course of its lengthy exposition, however, the dissent never comes to grips with the crucial distinguishing feature of this case—that Burbine at no point requested the presence of counsel, as was his right under *Miranda* to do. We do not quarrel with the dissent's characterization of police interrogation as a "privilege terminable at the will of the suspect."  *Post*, at 458. We reject, however, the dissent's entirely undefended suggestion that the Fifth Amendment "right to counsel" requires anything more than that the police inform the suspect of his right to representation and honor his request that the interrogation cease until his attorney is present.  See, *e. g.*, *Michigan* v. *Mosley*, 423 U. S. 96, 104, n. 10 (1975).

matter of ethics, such conduct is only relevant to the constitu-
tional validity of a waiver if it deprives a defendant of knowl-
edge essential to his ability to understand the nature of his
rights and the consequences of abandoning them. Because
respondent's voluntary decision to speak was made with full
awareness and comprehension of all the information *Miranda*
requires the police to convey, the waivers were valid.

## B

At oral argument respondent acknowledged that a con-
stitutional rule requiring the police to inform a suspect of an
attorney's efforts to reach him would represent a significant
extension of our precedents. Tr. of Oral Arg. 32–33. He
contends, however, that the conduct of the Providence police
was so inimical to the Fifth Amendment values *Miranda*
seeks to protect that we should read that decision to condemn
their behavior. Regardless of any issue of waiver, he urges,
the Fifth Amendment requires the reversal of a conviction if
the police are less than forthright in their dealings with an
attorney or if they fail to tell a suspect of a lawyer's unilateral
efforts to contact him. Because the proposed modification
ignores the underlying purposes of the *Miranda* rules and be-
cause we think that the decision as written strikes the proper
balance between society's legitimate law enforcement inter-
ests and the protection of the defendant's Fifth Amendment
rights, we decline the invitation to further extend *Miranda*'s
reach.

At the outset, while we share respondent's distaste for the
deliberate misleading of an officer of the court, reading
*Miranda* to forbid police deception of an *attorney* "would cut
[the decision] completely loose from its own explicitly stated
rationale." *Beckwith* v. *United States*, 425 U. S. 341, 345
(1976). As is now well established, "[t]he . . . *Miranda*
warnings are 'not themselves rights protected by the Con-
stitution but [are] instead measures to insure that the [sus-
pect's] right against compulsory self-incrimination [is] pro-

tected.'" *New York* v. *Quarles,* 467 U. S. 649, 654 (1984), quoting *Michigan* v. *Tucker,* 417 U. S. 433, 444 (1974). Their objective is not to mold police conduct for its own sake. Nothing in the Constitution vests in us the authority to mandate a code of behavior for state officials wholly unconnected to any federal right or privilege. The purpose of the *Miranda* warnings instead is to dissipate the compulsion inherent in custodial interrogation and, in so doing, guard against abridgment of the suspect's Fifth Amendment rights. Clearly, a rule that focuses on how the police treat an attorney—conduct that has no relevance at all to the degree of compulsion experienced by the defendant during interrogation—would ignore both *Miranda*'s mission and its only source of legitimacy.

Nor are we prepared to adopt a rule requiring that the police inform a suspect of an attorney's efforts to reach him. While such a rule might add marginally to *Miranda*'s goal of dispelling the compulsion inherent in custodial interrogation, overriding practical considerations counsel against its adoption. As we have stressed on numerous occasions, "[o]ne of the principal advantages" of *Miranda* is the ease and clarity of its application. *Berkemer* v. *McCarty,* 468 U. S. 420, 430 (1984); see also *New York* v. *Quarles, supra,* at 662–664 (concurring opinion); *Fare* v. *Michael C.,* 442 U. S., at 718. We have little doubt that the approach urged by respondent and endorsed by the Court of Appeals would have the inevitable consequence of muddying *Miranda*'s otherwise relatively clear waters. The legal questions it would spawn are legion: To what extent should the police be held accountable for knowing that the accused has counsel? Is it enough that someone in the station house knows, or must the interrogating officer himself know of counsel's efforts to contact the suspect? Do counsel's efforts to talk to the suspect concerning one criminal investigation trigger the obligation to inform the defendant before interrogation may proceed on a wholly separate matter? We are unwilling to modify *Miranda* in a

manner that would so clearly undermine the decision's central "virtue of informing police and prosecutors with specificity . . . what they may do in conducting [a] custodial interrogation, and of informing courts under what circumstances statements obtained during such interrogation are not admissible." *Fare* v. *Michael C., supra,* at 718.

Moreover, problems of clarity to one side, reading *Miranda* to require the police in each instance to inform a suspect of an attorney's efforts to reach him would work a substantial and, we think, inappropriate shift in the subtle balance struck in that decision. Custodial interrogations implicate two competing concerns. On the one hand, "the need for police questioning as a tool for effective enforcement of criminal laws" cannot be doubted. *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 225 (1973). Admissions of guilt are more than merely "desirable," *United States* v. *Washington,* 431 U. S., at 186; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law. On the other hand, the Court has recognized that the interrogation process is "inherently coercive" and that, as a consequence, there exists a substantial risk that the police will inadvertently traverse the fine line between legitimate efforts to elicit admissions and constitutionally impermissible compulsion. *New York* v. *Quarles, supra,* at 656. *Miranda* attempted to reconcile these opposing concerns by giving the *defendant* the power to exert some control over the course of the interrogation. Declining to adopt the more extreme position that the actual presence of a lawyer was necessary to dispel the coercion inherent in custodial interrogation, see Brief for American Civil Liberties Union as *Amicus Curiae* in *Miranda* v. *Arizona,* O. T. 1965, No. 759, pp. 22–31, the Court found that the suspect's Fifth Amendment rights could be adequately protected by less intrusive means. Police questioning, often an essential part of the investigatory process, could continue in its traditional form, the Court held, but only if the suspect clearly under-

stood that, at any time, he could bring the proceeding to a halt or, short of that, call in an attorney to give advice and monitor the conduct of his interrogators.

The position urged by respondent would upset this carefully drawn approach in a manner that is both unnecessary for the protection of the Fifth Amendment privilege and injurious to legitimate law enforcement. Because, as *Miranda* holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process, a rule requiring the police to inform the suspect of an attorney's efforts to contact him would contribute to the protection of the Fifth Amendment privilege only incidentally, if at all. This minimal benefit, however, would come at a substantial cost to society's legitimate and substantial interest in securing admissions of guilt. Indeed, the very premise of the Court of Appeals was not that awareness of Ms. Munson's phone call would have dissipated the coercion of the interrogation room, but that it might have convinced respondent not to speak at all. 753 F. 2d, at 185. Because neither the letter nor purposes of *Miranda* require this additional handicap on otherwise permissible investigatory efforts, we are unwilling to expand the *Miranda* rules to require the police to keep the suspect abreast of the status of his legal representation.

We acknowledge that a number of state courts have reached a contrary conclusion. Compare *State* v. *Jones*, 19 Wash. App. 850, 578 P. 2d 71 (1978), with *State* v. *Beck*, 687 S. W. 2d 155 (Mo. 1985) (en banc). We recognize also that our interpretation of the Federal Constitution, if given the dissent's expansive gloss, is at odds with the policy recommendations embodied in the American Bar Association Standards of Criminal Justice. Cf. ABA Standards for Criminal Justice 5–7.1 (2d ed. 1980). Notwithstanding the dissent's protestations, however, our interpretive duties go well beyond deferring to the numerical preponderance of lower court decisions or to the subconstitutional recommen-

dations of even so esteemed a body as the American Bar Association. See *Nix* v. *Whiteside, ante,* at 189 (BLACKMUN, J., concurring in judgment). Nothing we say today disables the States from adopting different requirements for the conduct of its employees and officials as a matter of state law. We hold only that the Court of Appeals erred in construing the Fifth Amendment to the Federal Constitution to require the exclusion of respondent's three confessions.

### III

Respondent also contends that the Sixth Amendment requires exclusion of his three confessions.[2] It is clear, of course, that, absent a valid waiver, the defendant has the right to the presence of an attorney during any interrogation occurring after the first formal charging proceeding, the point at which the Sixth Amendment right to counsel initially attaches. *United States* v. *Gouveia,* 467 U. S. 180, 187 (1984); *Kirby* v. *Illinois,* 406 U. S. 682, 689 (1972) (opinion of Stewart, J.). See *Brewer* v. *Williams,* 430 U. S., at 400–401. And we readily agree that once the right *has* attached, it follows that the police may not interfere with the efforts of a defendant's attorney to act as a "'medium' between [the suspect] and the State" during the interrogation. *Maine* v. *Moulton,* 474 U. S. 159, 176 (1985); see *Brewer* v. *Williams, supra,* at 401, n. 8. The difficulty for respondent is that the interrogation sessions that yielded the inculpatory statements took place *before* the initiation of "adversary judicial proceedings." *United States* v. *Gouveia, supra,* at 192. He contends, however, that this circumstance is not fatal to his Sixth Amendment claim. At least in some situations, he argues, the Sixth Amendment protects the integrity of the

---

[2] Petitioner does not argue that respondent's valid waiver of his Fifth Amendment right to counsel necessarily served to waive his parallel rights under the Sixth Amendment. Accordingly, we have no occasion to consider whether a waiver for one purpose necessarily operates as a general waiver of the right to counsel for all purposes.

attorney-client relationship[3] regardless of whether the prosecution has in fact commenced "by way of formal charge, preliminary hearing, indictment, information or arraignment." 467 U. S., at 188. Placing principal reliance on a footnote in *Miranda,* 384 U. S., at 465, n. 35, and on *Escobedo* v. *Illinois,* 378 U. S. 478 (1964), he maintains that *Gouveia, Kirby,* and our other "critical stage" cases, concern only the narrow question of when the right *to* counsel—that is, to the appointment or presence of counsel—attaches. The right to noninterference with an attorney's dealings with a criminal suspect, he asserts, arises the moment that the relationship is formed, or, at the very least, once the defendant is placed in custodial interrogation.

We are not persuaded. At the outset, subsequent decisions foreclose any reliance on *Escobedo* and *Miranda* for the proposition that the Sixth Amendment right, in any of its manifestations, applies prior to the initiation of adversary judicial proceedings. Although *Escobedo* was originally decided as a Sixth Amendment case, "the Court in retrospect perceived that the 'prime purpose' of *Escobedo* was not to vindicate the constitutional right to counsel as such, but, like *Miranda,* 'to guarantee full effectuation of the privilege against self-incrimination . . . .'" *Kirby* v. *Illinois, supra,*

---

[3] Notwithstanding the Rhode Island Supreme Court's finding that, as a matter of state law, no attorney-client relationship existed between respondent and Ms. Munson, the Sixth Amendment issue is properly before us. *State* v. *Burbine,* 451 A. 2d 22, 29 (1982). Petitioner now concedes that such a relationship existed and invites us to decide the Sixth Amendment question based on that concession. Of course, a litigant's concession cannot be used to circumvent the rule that this Court may not disregard a state court's interpretation of state law. Respondent's argument, however, does not focus on whether an attorney-client relationship actually existed as a formal matter of state law. He argues instead that, on the particular facts of this case, the Sixth Amendment right to counsel has been violated. In any event, even if the existence of an attorney-client relationship could somehow independently trigger the Sixth Amendment right to counsel, a position we reject, the type of circumstances that would give rise to the right would certainly have a federal definition.

at 689, quoting *Johnson* v. *New Jersey*, 384 U. S. 719, 729 (1966). Clearly then, *Escobedo* provides no support for respondent's argument. Nor, of course, does *Miranda*, the holding of which rested exclusively on the Fifth Amendment. Thus, the decision's brief observation about the reach of *Escobedo*'s Sixth Amendment analysis is not only dictum, but reflects an understanding of the case that the Court has expressly disavowed. See also, *United States* v. *Gouveia*, *supra*, at 188, n. 5; Y. Kamisar, Police Interrogation and Confessions 217–218, n. 94 (1980).

Questions of precedent to one side, we find respondent's understanding of the Sixth Amendment both practically and theoretically unsound. As a practical matter, it makes little sense to say that the Sixth Amendment right to counsel attaches at different times depending on the fortuity of whether the suspect or his family happens to have retained counsel prior to interrogation. Cf. *id.*, at 220–221. More importantly, the suggestion that the existence of an attorney-client relationship itself triggers the protections of the Sixth Amendment misconceives the underlying purposes of the right to counsel. The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a suspect from the consequences of his own candor. Its purpose, rather, is to assure that in any "criminal prosecutio[n]," U. S. Const., Amdt. 6, the accused shall not be left to his own devices in facing the "'prosecutorial forces of organized society.'" *Maine* v. *Moulton, supra*, at 170 (quoting *Kirby* v. *Illinois*, 406 U. S., at 689). By its very terms, it becomes applicable only when the government's role shifts from investigation to accusation. For it is only then that the assistance of one versed in the "intricacies . . . of law," *ibid.*, is needed to assure that the prosecution's case encounters "the crucible of meaningful adversarial testing." *United States* v. *Cronic*, 466 U. S. 648, 656 (1984).

Indeed, in *Maine* v. *Moulton*, decided this Term, the Court again confirmed that looking to the initiation of adversary judicial proceedings, far from being mere formalism, is fundamental to the proper application of the Sixth Amendment right to counsel. There, we considered the constitutional implications of a surreptitious investigation that yielded evidence pertaining to two crimes. For one, the defendant had been indicted; for the other, he had not. Concerning the former, the Court reaffirmed that after the first charging proceeding the government may not deliberately elicit incriminating statements from an accused out of the presence of counsel. See also *Massiah* v. *United States*, 377 U. S. 201 (1964). The Court made clear, however, that the evidence concerning the crime for which the defendant had not been indicted—evidence obtained in precisely the same manner from the identical suspect—would be admissible at a trial limited to those charges. *Maine* v. *Moulton*, 474 U. S., at 180, and n. 16. The clear implication of the holding, and one that confirms the teaching of *Gouveia*, is that the Sixth Amendment right to counsel does not attach until after the initiation of formal charges. Moreover, because Moulton already had legal representation, the decision all but forecloses respondent's argument that the attorney-client relationship itself triggers the Sixth Amendment right.

Respondent contends, however, that custodial interrogations require a different rule. Because confessions elicited during the course of police questioning often seal a suspect's fate, he argues, the need for an advocate—and the concomitant right to noninterference with the attorney-client relationship—is at its zenith, regardless of whether the State has initiated the first adversary judicial proceeding. We do not doubt that a lawyer's presence could be of value to the suspect; and we readily agree that if a suspect confesses, his attorney's case at trial will be that much more difficult. But these concerns are no more decisive in this context than they were for the equally damaging preindictment lineup

at issue in *Kirby*, or the statements pertaining to the unindicted crime elicted from the defendant in *Maine* v. *Moulton*. Compare *United States* v. *Wade*, 388 U. S. 218, 226–227 (1967) (Sixth Amendment attaches at postindictment lineup); *Massiah* v. *United States, supra* (after indictment, police may not elicit statements from suspect out of the presence of counsel). For an interrogation, no more or less than for any other "critical" pretrial event, the possibility that the encounter may have important consequences at trial, standing alone, is insufficient to trigger the Sixth Amendment right to counsel. As *Gouveia* made clear, until such time as the "'government has committed itself to prosecute, and . . . the adverse positions of government and defendant have solidified'" the Sixth Amendment right to counsel does not attach. 467 U. S., at 189 (quoting *Kirby* v. *Illinois, supra,* at 689).

Because, as respondent acknowledges, the events that led to the inculpatory statements preceded the formal initiation of adversary judicial proceedings, we reject the contention that the conduct of the police violated his rights under the Sixth Amendment.

## IV

Finally, respondent contends that the conduct of the police was so offensive as to deprive him of the fundamental fairness guaranteed by the Due Process Clause of the Fourteenth Amendment. Focusing primarily on the impropriety of conveying false information to an attorney, he invites us to declare that such behavior should be condemned as violative of canons fundamental to the "'traditions and conscience of our people.'" *Rochin* v. *California*, 342 U. S. 165, 169 (1952), quoting *Snyder* v. *Massachusetts*, 291 U. S. 97, 105 (1934). We do not question that on facts more egregious than those presented here police deception might rise to a level of a due process violation. Accordingly, JUSTICE STE-

VENS' apocalyptic suggestion that we have approved any and all forms of police misconduct is demonstrably incorrect.[4] We hold only that, on these facts, the challenged conduct falls short of the kind of misbehavior that so shocks the sensibil-

---

[4] Among its other failings, the dissent declines to follow *Oregon* v. *Elstad*, 470 U. S. 298 (1985), a decision that categorically forecloses JUSTICE STEVENS' major premise—that *Miranda* requires the police to inform a suspect of any and all information that would be useful to a decision whether to remain silent or speak with the police. See also *United States* v. *Washington*, 431 U. S. 181, 188 (1977). The dissent also launches a novel "agency" theory of the Fifth Amendment under which any perceived deception of a lawyer is automatically treated as deception of his or her client. This argument entirely disregards the elemental and established proposition that the privilege against compulsory self-incrimination is, by hypothesis, a personal one that can only be invoked by the individual whose testimony is being compelled.

Most importantly, the dissent's misreading of *Miranda* itself is breathtaking in its scope. For example, it reads *Miranda* as creating an undifferentiated right to the presence of an attorney that is triggered automatically by the initiation of the interrogation itself. *Post*, at 463. Yet, as both *Miranda* and subsequent decisions construing *Miranda* make clear beyond refute, " 'the interrogation must cease until an attorney is present' *only* '[i]f the individual states that he wants an attorney.' " *Michigan* v. *Mosley*, 423 U. S. 96, 104, n. 10 (1975) (emphasis added), quoting *Miranda*, 384 U. S., at 474. The dissent condemns us for embracing "incommunicado questioning . . . as a societal goal of the highest order that justifies police deception of the shabbiest kind." *Post*, at 439. We, of course, do nothing of the kind. As any reading of *Miranda* reveals, the decision, rather than proceeding from the premise that the rights and needs of the defendant are paramount to all others, embodies a carefully crafted balance designed to fully protect *both* the defendant's and society's interests. The dissent may not share our view that the Fifth Amendment rights of the defendant are amply protected by application of *Miranda as written*. But the dissent is "simply wrong," *post*, at 452, in suggesting that exclusion of Burbine's three confessions follows perfunctorily from *Miranda*'s mandate. Y. Kamisar, Police Interrogation and Confessions 217–218, n. 94 (1980).

Quite understandably, the dissent is outraged by the very idea of police deception of a lawyer. Significantly less understandable is its willingness to misconstrue this Court's constitutional holdings in order to implement its subjective notions of sound policy.

ities of civilized society as to warrant a federal intrusion into the criminal processes of the States.

We hold therefore that the Court of Appeals erred in finding that the Federal Constitution required the exclusion of the three inculpatory statements. Accordingly, we reverse and remand for proceedings consistent with this opinion.

*So ordered.*

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

This case poses fundamental questions about our system of justice. As this Court has long recognized, and reaffirmed only weeks ago, "ours is an accusatorial and not an inquisitorial system." *Miller* v. *Fenton*, 474 U. S. 104, 110 (1985).[1] The Court's opinion today represents a startling departure from that basic insight.

---

[1] Justice Frankfurter succinctly explained the character of that distinction in his opinion in *Watts* v. *Indiana*, 338 U. S. 49, 54 (1949):

"Ours is the accusatorial as opposed to the inquisitorial system. Such has been the characteristic of Anglo-American criminal justice since it freed itself from practices borrowed by the Star Chamber from the Continent whereby an accused was interrogated in secret for hours on end. See Ploscowe, *The Development of Present-Day Criminal Procedures in Europe and America*, 48 Harv. L. Rev. 433, 457–458, 467–473 (1935). Under our system society carries the burden of proving its charge against the accused not out of his own mouth. It must establish its case, not by interrogation of the accused even under judicial safeguards, but by evidence independently secured through skillful investigation. 'The law will not suffer a prisoner to be made the deluded instrument of his own conviction.' 2 Hawkins, Pleas of the Crown, c. 46, § 34 (8th ed. 1824). The requirement of specific charges, their proof beyond a reasonable doubt, the protection of the accused from confessions extorted through whatever form of police pressures, the right to a prompt hearing before a magistrate, the right to assistance of counsel, to be supplied by government when circumstances make it necessary, the duty to advise an accused of his constitutional rights — these are all characteristics of the accusatorial system and manifestations of its demands. Protracted, systematic and uncontrolled subjection of an accused to interrogation by the police for the purpose of eliciting disclosures or confession is subversive of the accusatorial system."

The Court concludes that the police may deceive an attorney by giving her false information about whether her client will be questioned, and that the police may deceive a suspect by failing to inform him of his attorney's communications and efforts to represent him.[2]  For the majority, this conclusion, though "distaste[ful]," *ante*, at 424, is not even debatable. The deception of the attorney is irrelevant because the attorney has no right to information, accuracy, honesty, or fairness in the police response to her questions about her client. The deception of the client is acceptable, because, although the information would affect the client's assertion of his rights, the client's actions in ignorance of the availability of his attorney are voluntary, knowing, and intelligent; additionally, society's interest in apprehending, prosecuting, and punishing criminals outweighs the suspect's interest in information regarding his attorney's efforts to communicate with him.  Finally, even mendacious police interference in the communications between a suspect and his lawyer does not violate any notion of fundamental fairness because it does not shock the conscience of the majority.

The case began in March 1977 with the discovery of Mary Jo Hickey, unconscious and disheveled in a deserted parking lot, lying in a pool of blood, with semen on her clothes, her dentures broken, and a piece of heavy, bloodstained metal nearby.  Days later, Brian Burbine, then 20 years old, went to Maine and stayed with friends.  According to the friends' testimony at trial, he was upset, and described a night out with Hickey, who was then 35.  After several drinks,

See generally *Malloy* v. *Hogan*, 378 U. S. 1, 7–8 (1964); *Rogers* v. *Richmond*, 365 U. S. 534, 540–541 (1961); *Bram* v. *United States*, 168 U. S. 532, 543–545 (1897).

[2] I agree with the majority that, in considering "the type of circumstances" that give rise to constitutional rights in this area, the relationship between an attorney and suspect has "a federal definition." *Ante*, at 429, n. 3.  In my view, for federal constitutional purposes, members of a suspect's family may provide a lawyer with authority to act on a suspect's behalf while the suspect is in custody.

Burbine told them, a ride home turned into a violent encounter; he hit Hickey several times and threw her out of the car. Three weeks after she was discovered in the parking lot, Hickey died. Three months later, after the 21-hour period of detention by the Cranston and Providence, Rhode Island, police that is the focus of this dispute, Burbine was charged with her murder, and ultimately found guilty of it.

The murder of Mary Jo Hickey was a vicious crime, fully meriting a sense of outrage and a desire to find and prosecute the perpetrator swiftly and effectively. Indeed, by the time Burbine was arrested on an unrelated breaking-and-entering charge, the Hickey murder had been the subject of a local television special.[3] Not surprisingly, Detective Ferranti, the Cranston Detective who "broke" the case, was rewarded with a special commendation for his efforts.[4]

The recognition that ours is an accusatorial, and not an inquisitorial system nevertheless requires that the government's actions, even in responding to this brutal crime, respect those liberties and rights that distinguish this society from most others. As Justice Jackson observed shortly after his return from Nuremberg, cases of this kind present "a real dilemma in a free society . . . for the defendant is shielded by such safeguards as no system of law except the Anglo-American concedes to him."[5] Justice Frankfurter similarly

---

[3] Tr. of Suppression Hearing 167 (S. H.).

[4] *Id.*, at 168.

[5] "Amid much that is irrelevant or trivial, one serious situation seems to me to stand out in these cases. The suspect neither had nor was advised of his right to get counsel. This presents a real dilemma in a free society. To subject one without counsel to questioning which may and is intended to convict him is a real peril to individual freedom. To bring in a lawyer means a real peril to solution of the crime, because, under our adversary system, he deems that his sole duty is to protect his client—guilty or innocent—and that in such a capacity he owes no duty whatever to help society solve its crime problem. Under this conception of criminal procedure, any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances.

emphasized that it is "a fair summary of history to say that the safeguards of liberty have been forged in controversies involving not very nice people."[6] And, almost a century and a half ago, Macaulay observed that the guilt of Titus Oates could not justify his conviction by improper methods: "That Oates was a bad man is not a sufficient excuse; for the guilty are almost always the first to suffer those hardships which are afterwards used as precedents against the innocent."[7]

The Court's holding focuses on the period after a suspect has been taken into custody and before he has been charged with an offense. The core of the Court's holding is that police interference with an attorney's access to her client during that period is not unconstitutional. The Court reasons that a State has a compelling interest, not simply in custodial interrogation, but in lawyer-free, incommunicado custodial interrogation. Such incommunicado interrogation is so important that a lawyer may be given false information that prevents her presence and representation; it is so important that police may refuse to inform a suspect of his attorney's

"If the State may arrest on suspicion and interrogate without counsel, there is no denying the fact that it largely negates the benefits of the constitutional guaranty of the right to assistance of counsel. Any lawyer who has ever been called into a case after his client has 'told all' and turned any evidence he has over to the Government, knows how helpless he is to protect his client against the facts thus disclosed.

"I suppose the view one takes will turn on what one thinks should be the right of an accused person against the State. Is it his right to have the judgment on the facts? Or is it his right to have a judgment based on only such evidence as he cannot conceal from the authorities, who cannot compel him to testify in court and also cannot question him before? Our system comes close to the latter by any interpretation, for the defendant is shielded by such safeguards as no system of law except the Anglo-American concedes to him." *Watts* v. *Indiana*, 338 U. S. 49, 59 (1949) (Jackson, J., concurring in result).

[6] *United States* v. *Rabinowitz*, 339 U. S. 56, 69 (1950) (Frankfurter, J., dissenting).

[7] 1 T. Macaulay, The History of England 482 (1968 ed.).

communications and immediate availability.[8]   This conclusion flies in the face of this Court's repeated expressions of deep concern about incommunicado questioning.[9]   Until

---

[8] This kind of police-maintained incommunicado questioning becomes, in the Court's rendition, "an essential part of the investigatory process." *Ante,* at 426.   Police interference in communications between a lawyer and her client are justified because "[a]dmissions of guilt . . . are essential to society's compelling interest in finding, convicting, and punishing those who violate the law." *Ibid.*   It is this overriding interest in obtaining self-incriminatory statements in the lawyer-free privacy of the police interrogation room that motivates the Court's willingness to swallow its admitted "distaste for the deliberate misleading of an officer of the court." *Ante,* at 424.

[9] See, *e. g., Tague* v. *Louisiana,* 444 U. S. 469, 470 (1980) *(per curiam)* (State bears " 'heavy burden' " in proving validity of waivers given " 'during incommunicado interrogation' "); *Beckwith* v. *United States,* 425 U. S. 341, 346 (1976) ("special safeguards" are required for "incommunicado interrogation of individuals in a police-dominated atmosphere"); *Darwin* v. *Connecticut,* 391 U. S. 346, 349 (1968) *(per curiam)* (prolonged "incommunicado" interrogation renders confession involuntary); *Miranda* v. *Arizona,* 384 U. S. 436, 475 (1966) (State has "heavy burden" in proving validity of waiver of rights in "incommunicado interrogation"); *Haynes* v. *Washington,* 373 U. S. 503, 514 (1963) ("incommunicado detention" rendered confession involuntary); *Ashcraft* v. *Tennessee,* 322 U. S. 143, 153, n. 8 (1944) (" 'Holding incommunicado is objectionable because arbitrary — at the mere will and unregulated pleasure of a police officer' "); *Ward* v. *Texas,* 316 U. S. 547, 555 (1942) ("This Court has set aside convictions based upon confessions extorted from ignorant persons . . . who have been unlawfully held incommunicado without advice of friends or counsel"); *Lisenba* v. *California,* 314 U. S. 219, 240 (1941) ("[W]here a prisoner, held incommunicado, is subjected to questioning by officers for long periods, and deprived of the advice of counsel, we shall scrutinize the record with care to determine whether, by the use of his confession, he is deprived of liberty or life through tyrannical or oppressive means"); *Wan* v. *United States,* 266 U. S. 1, 11 (1924) (holding of suspect "incommunicado" contributes to suppression of confession).

To be sure, in many of these cases, the evidence showed that the suspect had requested, and was denied access to, a lawyer.   Until today, however, the Court has never viewed "incommunicado" as applying only to the denial of the suspect's efforts to reach the attorney, and not to the attorney's efforts to reach the suspect.   See, *e. g., Darwin* v. *Connecticut,* 391 U. S.,

today, incommunicado questioning has been viewed with the strictest scrutiny by this Court; today, incommunicado questioning is embraced as a societal goal of the highest order that justifies police deception of the shabbiest kind.

It is not only the Court's ultimate conclusion that is deeply disturbing; it is also its manner of reaching that conclusion. The Court completely rejects an entire body of law on the subject—the many carefully reasoned state decisions that have come to precisely the opposite conclusion.[10]  The Court

---

at 349 *(per curiam)* (referring *both* to fact that "petitioner's lawyers made numerous attempts to communicate with petitioner or with the officer in charge" and to fact that "petitioner on three separate occasions sought and was denied permission to communicate with the outside world" in reaching the "inescapable" conclusion that "the officers kept petitioner incommunicado").  It is also true that many of these cases involved incommunicado interrogations for very long periods of time; not one of those cases suggested that incommunicado interrogation for shorter periods, maintained by misinforming attorney and client of each other's actions, was supported by a compelling societal interest that justified police deception and misinformation about attorney communications.

[10] The American Bar Association has summarized the relevant cases:

"In all but the last two of the following cases, the Court excluded the statement(s) obtained.  *Elfadl* v. *Maryland,* 61 Md. App. 132, 485 A. 2d 275, *cert. denied,* 303 Md. 42, 491 A. 2d 1197, *petition for cert. filed,* 54 U. S. L. W. 3019 (U. S. June 21, 1985) (No. 85–24) (lawyer retained by defendant's wife refused permission to communicate with defendant or have him informed of counsel's presence); *Lodowski* v. *Maryland,* 302 Md. 691, 490 A. 2d 1228 (1985), *petition for cert. filed,* 54 U. S. L. W. 3019 (U. S. June 21, 1985) (No. 85–23) (police prevented communication between lawyer and defendant and did not tell defendant that lawyer was present); *Dunn* v. *State,* No. 248–84 (Tex. June 26, 1985), summarized, 37 Crim. L. Rep. (BNA) 2274 (July 17, 1985) (suspect not told that his wife had retained an attorney who was close at hand); *Lewis* v. *State,* 695 P. 2d 528 (Okla. 1984) (lawyer hired by defendant's parents misdirected by sheriff throughout jail and courthouse while defendant, unaware that parents had retained attorney, was being interrogated in another part of the building); *Commonwealth* v. *Sherman,* 389 Mass. 287, 450 N. E. 2d 566 (1983) (police failed to honor lawyer's request to be present during interrogation and failed to inform suspect of the request); *Weber* v. *State,* 457 A. 2d 674 (Del. 1983) (defendant's father and attorney hired by the father refused

similarly dismisses the fact that the police deception which it sanctions quite clearly violates the American Bar Association's Standards for Criminal Justice[11]—Standards which

access to defendant; police failed to inform defendant of lawyer's presence); *People* v. *Smith*, 93 Ill. 2d 179, 442 N. E. 2d 1325 (1982) (associate of defendant's retained lawyer denied access to client based on fabricated claim that defendant was undergoing drug withdrawal and would not be interrogated in the near future; individual never told of lawyer's attempt to see him although he was given card lawyer left for him); *State* v. *Matthews*, 408 So. 2d 1274 (La. 1982) (attorney's request to speak with defendant refused and instruction to cease interrogation ignored); *State* v. *Haynes*, 288 Or. 59, 602 P. 2d 272 (1979), *cert. denied*, 446 U. S. 945 (1980) (lawyer retained by defendant's wife was told where defendant was being held but the police moved him before lawyer could offer counsel and defendant never told of lawyer's request to offer counsel); *State* v. *Jones*, 19 Wash. App. 850, [5]78 P. 2d 71 (1978) (defendant not informed that counsel had been retained for him or that attorney had instructed client not to speak); *Commonwealth* v. *Hilliard*, 471 Pa. 318, 370 A. 2d 322 (1977) (lawyer first misinformed that defendant was not in custody and later denied access to defendant until he confessed; defendant was not told of lawyer's presence until he confessed); *State* v. *Jackson*, 303 So. 2d 734 (La. 1974) (lawyer retained by defendant's family denied permission to see defendant who was not told of the lawyer's presence); *Commonwealth* v. *McKenna*, 355 Mass. 313, 244 N. E. 2d 560 (1969) (lawyer retained by suspect's mother asked to see client; police misinformed lawyer of suspect's whereabouts and did not indicate that he was already being interrogated); *Blanks* v. *State*, [254 Ga. 420], 330 S. E. 2d 575 (1985) (police finished taking confession before advising defendant that a lawyer was present who wished to see him); *State* v. *Beck*, 687 S. W. 2d 155 (Mo. 1985) (en banc) (lawyer obtained by defendant's mother at defendant's direction given before he was in custody; lawyer called the police and asked to be notified when defendant was arrested but at prosecutor's suggestion police did not so notify lawyer when defendant was arrested in Florida, nor did they advise defendant of lawyer's request)." Brief for American Bar Association as *Amicus Curiae* 4, n. 2.

Since the filing of the ABA brief, still another State Supreme Court has expressed this prevailing view that statements obtained through police interference in communications between an attorney and a suspect must be suppressed. See *Haliburton* v. *Florida*, 476 So. 2d 192 (Fla. 1985) (police continued questioning suspect without telling him that an attorney retained by his sister was at the police station seeking to speak with him).

[11] See ABA Standards for Criminal Justice 5–5.1 (2d ed. 1980) ("Counsel should be provided to the accused as soon as feasible after custody be-

THE CHIEF JUSTICE has described as "the single most comprehensive and probably the most monumental undertaking in the field of criminal justice ever attempted by the American legal profession in our national history,"[12] and which this Court frequently finds helpful.[13]   And, of course, the Court dismisses the fact that the American Bar Association has emphatically endorsed the prevailing state-court position and expressed its serious concern about the effect that a contrary view—a view, such as the Court's, that exalts incommunicado interrogation, sanctions police deception, and demeans the right to consult with an attorney—will have in police stations and courtrooms throughout this Nation.[14]   Of greatest importance, the Court misapprehends or rejects the central principles that have, for several decades, animated this Court's decisions concerning incommunicado interrogation.[15]

Police interference with communications between an attorney and his client is a recurrent problem.   The factual variations in the many state-court opinions condemning this interference as a violation of the Federal Constitution suggest the

gins"); ABA Standards for Criminal Justice 5–7.1 (2d ed. 1980) ("At the earliest opportunity, a person in custody should be effectively placed in communication with a lawyer").

[12] Burger, Introduction: The ABA Standards for Criminal Justice, 12 Am. Crim. L. Rev. 251 (1974).   See also *id.*, at 253 ("Everyone connected with criminal justice should become totally familiar with the substantive content of the Standards. . . . [T]he Justices of the Supreme Court and hundreds of other judges . . . consult the Standards and make use of them whenever they are relevant").

[13] See, *e. g., Caldwell* v. *Mississippi,* 472 U. S. 320, 334, n. 6 (1985); *Holloway* v. *Arkansas,* 435 U. S. 475, 480, n. 4 (1978); *Dickey* v. *Florida,* 398 U. S. 30, 37–38, nn. 7 and 8 (1970).   Cf. *Nix* v. *Whiteside, ante,* at 167–168 (emphasizing ABA Model Code and Model Rules in Sixth Amendment analysis).

[14] See Brief for American Bar Association as *Amicus Curiae* 4 ("The ABA is deeply concerned that, if the police may constitutionally prevent any communication between a lawyer and an individual held in isolation, an important right to legal representation will be lost. . . . Many cases decided across the country demonstrate that there is cause for concern as to such police tactics").

[15] See n. 9, *supra.*

variety of contexts in which the problem emerges. In Oklahoma, police led a lawyer to several different locations while they interrogated the suspect;[16] in Oregon, police moved a suspect to a new location when they learned that his lawyer was on his way;[17] in Illinois, authorities failed to tell a suspect that his lawyer had arrived at the jail and asked to see him;[18] in Massachusetts, police did not tell suspects that their lawyers were at or near the police station.[19] In all these cases, the police not only failed to inform the suspect, but also misled the attorneys. The scenarios vary, but the core problem of police interference remains. "Its recurrence suggests that it has roots in some condition fundamental and general to our criminal system." *Watts* v. *Indiana,* 338 U. S. 49, 57 (1949) (Jackson, J., concurring in result).

The near-consensus of state courts and the legal profession's Standards about this recurrent problem lends powerful support to the conclusion that police may not interfere with communications between an attorney and the client whom they are questioning. Indeed, at least two opinions from this Court seemed to express precisely that view.[20] The Court today flatly rejects that widely held view and responds to this recurrent problem by adopting the most restrictive interpretation of the federal constitutional restraints on police

---

[16] *Lewis* v. *State,* 695 P. 2d 528 (Okla. Crim. App. 1984).

[17] *State* v. *Haynes,* 288 Ore. 59, 602 P. 2d 272 (1979), cert. denied, 446 U. S. 945 (1980).

[18] *People* v. *Smith,* 93 Ill. 2d 179, 442 N. E. 2d 1325 (1982).

[19] *Commonwealth* v. *McKenna,* 355 Mass. 313, 244 N. E. 2d 560 (1969).

[20] See *Miranda* v. *Arizona,* 384 U. S., at 465, n. 35 (In *Escobedo,* "[t]he police also prevented the attorney from consulting with his client. Independent of any other constitutional proscription, this action constitutes a violation of the Sixth Amendment right to the assistance of counsel and excludes any statement obtained in its wake"); *Escobedo* v. *Illinois,* 378 U. S. 478, 487 (1964) ("[I]t 'would be highly incongruous if our system of justice permitted the district attorney, the lawyer representing the State, to extract a confession from the accused while his own lawyer, seeking to speak with him, was kept from him by the police'"), quoting *People* v. *Donovan,* 13 N. Y. 2d 148, 152, 193 N. E. 2d 628, 629 (1963).

deception, misinformation, and interference in attorney-client communications.

The exact reach of the Court's opinion is not entirely clear because, on the one hand, it indicates that more egregious forms of police deception might violate the Constitution, *ante*, at 432, while, on the other hand, it endeavors to make its disposition of this case palatable by making findings of fact concerning the voluntariness of Burbine's confessions that the trial judge who heard the evidence declined to make.[21] Before addressing the legal issues, it therefore seems appropriate to make certain additional comments about what the record discloses concerning the incriminating statements made by Burbine during the 21-hour period that he was detained by the Cranston and Providence police on June 29 and June 30, 1977.

I

As the majority points out, with respect to attorney Munson's telephone call, the Rhode Island Supreme Court's summary of factual findings provides the common ground for analysis:

> "At approximately 8:15 [on June 29, 1977], Ms. Munson called the Cranston police station and asked that her call be transferred to the detective division. A male voice responded with the word 'Detectives.' Ms. Munson identified herself and asked if Brian Burbine was being held; the person responded affirmatively. Ms. Munson explained to the person that Burbine was represented by attorney Casparian who was not available; she further stated that she would act as Burbine's legal counsel in the event that the police intended to place him in a lineup or question him. The unidentified person told Ms. Munson that the police would not be questioning Burbine or putting him in a lineup and that they were

[21] See *infra*, at 447–448; n. 25, *infra*.

through with him for the night. Ms. Munson was not informed that the Providence police were at the Cranston police station or that Burbine was a suspect in Mary's murder. The trial justice found as a fact that Ms. Munson did make the call, but further found that there was no collusion or conspiracy on the part of the police 'to secrete [Burbine] from his attorney . . . .'" *State* v. *Burbine*, 451 A. 2d 22, 23–24 (1982).[22]

Although this paragraph accurately describes attorney Munson's 8:15 call, the significance of the false response to her inquiry is best understood in the context of the events that were then proceeding in the police station. The difficulty in reconstructing some of those events illustrates the need for strict presumptions regarding the consequences of custodial interrogation—a need this Court has repeatedly recognized.[23]

---

[22] The Court of Appeals, see 753 F. 2d 178, 185 (CA1 1985), and the dissenting opinion of Justice Kelleher of the Rhode Island Supreme Court, see 451 A. 2d, at 38–39, were concerned by the apparent inconsistency between the finding that there was no conspiracy to "secrete" Burbine, and the unequivocal finding that attorney Munson's call had been made. I see no inconsistency, however, because the officer who gave the false information to attorney Munson acknowledged that Burbine was at the station—he did not "secrete" him. The state court's finding that the call was answered by "Detectives" is especially significant in light of Lieutenant Ricard's undisputed testimony that, at the time in question, only he or Detective Ferranti would have answered a call to the detectives division. S. H. 142. Thus, the state-court finding, and the evidence in the record on which it was based, make it perfectly clear that either Ricard or Ferranti must have known of the call. Both categorically denied any such knowledge in their testimony.·

[23] See, *e. g.*, *Edwards* v. *Arizona*, 451 U. S. 477 (1981); *Miranda* v. *Arizona*, 384 U. S. 436 (1966). Cf. *Oregon* v. *Bradshaw*, 462 U. S. 1039, 1044 (1983) (plurality opinion of REHNQUIST, J.) (*Edwards* articulated "a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers in the manner in which the defendant in *Edwards* was").

On June 27, 1977, an unidentified person advised Detective Ferranti that a man known as "Butch," who lived at 306 New York Avenue in Providence, was responsible for the death of Mary Jo Hickey. The record does not explain why Ferranti, who was a member of the Cranston Police Force, was informed about a crime that occurred in Providence.

At about 3 p.m. on June 29, 1977, Cranston police officers apprehended respondent Burbine and two other men (DiOrio and Sparks) in "a burned out building in the Cranston area." S. H. 6, 180. The three men were taken to the Cranston police station, charged with "breaking and entering," and placed in separate rooms. After noticing that DiOrio and Burbine lived at 306 New York Avenue in Providence, Detective Ferranti talked to DiOrio and was told that Burbine was the only "Butch" at that address. Id., at 146–147.

At approximately 4:30, Ferranti "went in the room where Burbine was" and asked him "if there was anybody that he knew by the name of Butch on the street, and he said he was the only Butch." Id., at 148.[24] After the brief questioning about the identity of "Butch," Detective Ferranti left Burbine in the interrogation room—where he remained until about 9 p.m.[25]—and interrogated DiOrio and Sparks. They both "made damaging statements relative to Burbine being involved in the murder in Providence"; Ferranti therefore "immediately contacted Providence Police." Id., at 149–150. The Providence officers—Captain Wilson (the Chief of Detectives), Lieutenant Gannon, and Detective Trafford—responded promptly, and arrived at the Cranston station be-

---

[24] In his police report completed the night of June 29, Detective Ferranti stated, in contrast to his testimony, that he questioned Burbine before questioning DiOrio. Defendant Ex. D.

[25] The Court makes its own findings about Burbine's access to a telephone during this period. Ante, at 418. No state court made such a finding, and the record contains no evidence indicating whether Burbine was told he could use the phone, whether an outside line was available without use of the police switchboard, or any number of other possibly relevant factors.

446

tween 6 and 7 p.m. Lieutenant Gannon testified that, as he drove to the Cranston police station, he knew that he might not be able to question Burbine "[i]f for some reason he didn't want to give me a statement, if for some reason he chose to get an attorney and the attorney informed us that he didn't want him to give a statement." Trial Tr. 407.

After arriving at the station, the three Providence officers, as well as Ferranti and a second Cranston officer (Lieutenant Ricard), either remained in the large central room in the basement of the Cranston police station, or participated in the questioning of DiOrio and Sparks in interrogation rooms adjacent to that large central room.

It was at this point—with Burbine alone in another adjacent room, with Providence police on hand, with police from two Departments questioning Sparks and DiOrio about Burbine's involvement in the Hickey homicide—that attorney Munson telephoned. Her call arrived at 8:15; she asked for "Detectives," and was told that the police "would not be questioning Burbine" and that they were "through" with him for the night. These statements were false. Moreover, she was not told that Burbine would be questioned about a homicide rather than the breaking-and-entering charge on which he had been arrested, and she was not told that Providence police were at the Cranston police station preparing to question Burbine about a Providence crime.

At about 9, some 45 minutes after Munson received the assurance that the police were "through" with Burbine, the officers completed their questioning of DiOrio and Sparks and were prepared to question Burbine. There is no dispute about the fact that Burbine was brought into the central room at about 9, that all five police officers were then present, and that Burbine appeared somewhat upset and professed that he "'didn't do anything wrong.'" S. H. 21. Detective Ferranti testified that this statement was in response to questions from the Providence police about the Hickey

homicide;[26] Lieutenant Gannon of the Providence police testified that the statement was about the Hickey homicide, but that Providence police did not question Burbine and that they merely saw Burbine being escorted by Ferranti.[27] Burbine was not told that attorney Munson had called and had asked about him; nor was he told that Munson had been informed that the police were through with him for the night. After his protestations, Burbine was taken into another interrogation room.

Detective Ferranti then went into that room and, according to the testimony of the Providence officers, spent either "ten minutes" or from "five to ten minutes" alone with Burbine.[28] The record does not tell us whether he told Burbine that Sparks and DiOrio had just given statements implicating him in the Hickey homicide. Nor does it resolve the question whether Burbine's decision to confess was made *before* his session with Ferranti or *as a result* of that session. The Court evidently makes the former assumption, for it asserts that Burbine "initiated" this encounter. *Ante*, at 421–422. However, the state courts made no finding about this

---

[26] See Testimony of Detective Ferranti, S. H. 152 (Providence police "started to question him relative to the murder in Providence"). See also Defendant Ex. D (Detective Ferranti's contemporaneous account) (Burbine "was confronted with this murder by Lt. Gan[n]on and other members of the PPD Det. Div. Lt. Ricard and myself. He flatly denied being involved or having any knowledge of this murder, although he did state that he had been in the bar with this girl and that he knew her from his mother who was friendly with her in the past").

[27] See, *e. g.*, Testimony of Lieutenant Gannon, S. H. 21 (agreeing with questioner's statement that "none of these police officers said anything to Brian Burbine before he said those things"). Cf. Testimony of Detective Trafford, *id.*, at 79 (Burbine "passed through the detective division and he was brought to, I believe, one of their interview rooms. . . . He was muttering something. I really don't know what he was saying").

[28] See *id.*, at 22, 57. Detective Ferranti testified that he was alone with Burbine for "a couple of minutes." *Id.*, at 174. He also testified that he went into the room, that Burbine told him to summon the Providence police, and that he complied "immediately." *Id.*, at 155.

"initiation" by Burbine. Detective Ferranti testified that Burbine banged and kicked on the door, S. H. 153–154; Lieutenant Gannon testified that he "believed" there was a knocking or some communication from Burbine, *id.*, at 22, but he was "not sure." *Id.*, at 66.[29] None of the other officers, who were apparently in the large room adjacent to Burbine's, corroborated this testimony by mentioning any "banging," "kicking," or other noise from Burbine's direction. In all events, some minutes later, Detective Ferranti came back out of the room and indicated that Burbine wanted to talk.

Lieutenant Gannon and Detective Trafford of the Providence police accompanied Detective Ferranti "back into the room." During the period between 9:30 and 10:20 p.m., they administered *Miranda* warnings and typed out a four-page statement which Burbine signed, waiving his constitutional rights, acknowledging his responsibility for the death of Hickey, and reciting his version of that event. Ferranti alternately testified that Burbine was "coherent" and "incoherent" at the time of this questioning. *Id.*, at 157–158; Trial Tr. 198, 208–209. Apparently for the first time since his arrival at the station in the afternoon, the police then brought Burbine some food. S. H. 160, Trial Tr. 205.

After obtaining Burbine's signature on the first written statement at 10:20 p.m., the police were still not "through" with Burbine. Burbine's first statement included no mention of the clothes that he had been wearing, or of a glass that was found with Hickey's purse a few blocks from the homicide. Soon after the completion of the first statement, and after the Providence and Cranston officers had discussed the first statement and expressed pleasure with their success,[30]

---

[29] See Testimony of Lieutenant Gannon, *id.*, at 63 ("I don't know if he knocked on the door. I'm not sure how we were re-summoned back into the room").

[30] See Testimony of Lieutenant Gannon, *id.*, at 62 (noting that, after first statement, officers discussed it and that "we were all collectively pleased that we did obtain a statement from him"). Major Leyden, a high-ranking

Gannon, Trafford, and Ferranti again questioned Burbine. They ascertained that he was wearing his "red toke" and "black windbreaker" at the time, and that Hickey had left the bar with a glass in hand.[31]  At 11:20 p.m., Burbine signed the second statement.

The following morning, the officers obtained a warrant, conducted a search of Burbine's residence, and seized the clothing that he had described in the second statement.   In the meantime, Burbine was arraigned in Cranston court on the charge for which he had been arrested.   Still without counsel, Burbine pleaded guilty to malicious damage.   After the Cranston proceeding, Providence officers instantly arrested him for the Hickey homicide.   Trial Tr. 501.   Burbine was taken to the Providence police station, where he executed a third waiver of rights and identified the coat and jacket that the officers had seized.   Shortly after noon, Major Leyden called the Public Defender's Office and requested counsel for Burbine because he would be placed in a lineup.   *Id.*, at 423.

Thus, although there are a number of ambiguities in the record, the state-court findings established (1) that attorney Munson made her call at about 8:15 p.m.; (2) that she was given false information; (3) that Burbine was not told of her

---

Providence officer, had been told about the break in the case, and he arrived at the Cranston station toward the end of Burbine's statement.

[31] According to Lieutenant Gannon, "in the second statement the questions about the glass and the clothes were Captain Wilson's ideas."   Trial Tr. 387.   The state courts made no finding about the initiation of the conversation leading to the second statement.   According to the signed statement, Lieutenant Gannon stated that Burbine "remembered something concerning a glass," App. to Pet. for Cert. 105, and Burbine did not contest that account.   Detective Ferranti testified that Providence police told him Burbine initiated the conversation.   Trial Tr. 252.   In contrast, Providence Detective Trafford testified that he was "not sure" how they concluded Burbine wished to speak again, but he "believe[d] Detective Ferranti notified us."   *Id.*, at 443.   Lieutenant Gannon testified that he "believe[d]" Burbine "indicated by knocking on the door."   *Id.*, at 409.

call; and (4) that he was thereafter given the *Miranda* warnings, waived his rights, and signed three incriminating statements without receiving any advice from an attorney. The remainder of the record underscores two points. The first is the context of the call—a context in which two Police Departments were on the verge of resolving a highly publicized, hauntingly brutal homicide and in which, as Lieutenant Gannon testified, the police were aware that counsel's advice to remain silent might be an obstacle to obtaining a confession. The second is the extent of the uncertainty about the events that motivated Burbine's decision to waive his rights. The lawyer-free privacy of the interrogation room, so exalted by the majority, provides great difficulties in determining what actually transpired. It is not simply the ambiguity that is troublesome; if so, the problem would be not unlike other difficult evidentiary problems. Rather, the particularly troublesome aspect is that the ambiguity arises in the very situation—incommunicado interrogation—for which this Court has developed strict presumptions and for which this Court has, in the past, imposed the heaviest burden of justification on the goverment. It is in this context, and the larger context of our accusatorial system, that the deceptive conduct of the police must be evaluated.

## II

Well-settled principles of law lead inexorably to the conclusion that the failure to inform Burbine of the call from his attorney makes the subsequent waiver of his constitutional rights invalid. Analysis should begin with an acknowledgment that the burden of proving the validity of a waiver of constitutional rights is always on the *government*.[32] When

[32] See, *e. g.*, *Brewer* v. *Williams*, 430 U. S. 387, 404 (1977) ("[C]ourts indulge in every reasonable presumption against waiver"); *Miranda* v. *Arizona*, 384 U. S., at 475 ("If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or

such a waiver occurs in a custodial setting, that burden is an especially heavy one because custodial interrogation is inherently coercive,[33] because disinterested witnesses are seldom available to describe what actually happened,[34] and because history has taught us that the danger of overreaching during incommunicado interrogation is so real.[35]

In applying this heavy presumption against the validity of waivers, this Court has sometimes relied on a case-by-case totality of the circumstances analysis.[36]  We have found, however, that some custodial interrogation situations require strict presumptions against the validity of a waiver. *Miranda* established that a waiver is not valid in the absence of certain warnings.  *Edwards* v. *Arizona,* 451 U. S. 477 (1981), similarly established that a waiver is not valid if police

---

appointed counsel. . . . Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders"); *Johnson* v. *Zerbst,* 304 U. S. 458, 464 (1938) (" '[C]ourts indulge every reasonable presumption against waiver' of fundamental constitutional rights and . . . we 'do not presume acquiescence in the loss of fundamental rights' ") (footnotes omitted).

[33] See *Miranda,* 384 U. S., at 455 ("[T]he very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals").

[34] There is a natural tendency to discredit the testimony of the suspect because of his obvious interest, but it is also true that there have been cases in which the desire to insure a conviction of an apparently guilty suspect has led police officers to color their testimony.  As Judge Wilkey observed in a different context, a police officer may "feel that he has a 'higher duty' than the truth.  He may perjure himself to convict the defendant." Wilkey, The Exclusionary Rule, 62 Judicature 215, 226 (1978).

[35] See *United States* v. *Carignan,* 342 U. S. 36, 46 (1951) (Douglas, J., concurring) ("What happens behind doors that are opened and closed at the sole discretion of the police is a black chapter in every country—the free as well as the despotic, the modern as well as the ancient").

[36] See, *e. g., Fare* v. *Michael C.,* 442 U. S. 707, 724–725 (1979); *North Carolina* v. *Butler,* 441 U. S. 369, 374–375 (1979); *Faretta* v. *California,* 422 U. S. 806, 835 (1975).

initiate questioning after the defendant has invoked his right to counsel. In these circumstances, the waiver is invalid as a matter of law even if the evidence overwhelmingly establishes, as a matter of fact, that "a suspect's decision not to rely on his rights was uncoerced, that he at all times knew that he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction," see *ante,* at 422. In light of our decision in *Edwards,* the Court is simply wrong in stating that "the analysis is complete and the waiver is valid as a matter of law" when these facts have been established. *Ante,* at 422–423.[37] Like the failure to give warnings and like police initiation of interrogation after a request for counsel, police deception of a suspect through omission of information regarding attorney communications greatly exacerbates the inherent problems of incommunicado interrogation and requires a clear principle to safeguard the presumption against the waiver of constitutional rights. As in those situations, the police deception should render a subsequent waiver invalid.

Indeed, as *Miranda* itself makes clear, proof that the required warnings have been given is a necessary, but by no means sufficient, condition for establishing a valid waiver. As the Court plainly stated in *Miranda,* "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege. The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth

---

[37] See also *Solem* v. *Stumes,* 465 U. S. 638, 641, 647–648 (1984) (Under *Edwards,* "once a suspect has invoked the right to counsel, any subsequent conversation must be initiated by him. . . . It does not in any way cast doubt on the legitimacy or necessity of *Edwards* to acknowledge that in some cases, a waiver could be knowing, voluntary, and intelligent even though it occurred when the police recommenced questioning after an accused had invoked the right to counsel").

Amendment privilege and not simply a preliminary ritual to existing methods of interrogation." 384 U. S., at 476.

In this case it would be perfectly clear that Burbine's waiver was invalid if, for example, Detective Ferranti had "threatened, tricked, or cajoled" Burbine in their private preconfession meeting—perhaps by misdescribing the statements obtained from DiOrio and Sparks—even though, under the Court's truncated analysis of the issue, Burbine fully understood his rights. For *Miranda* clearly condemns threats or trickery that cause a suspect to make an unwise waiver of his rights even though he fully understands those rights. In my opinion there can be no constitutional distinction—as the Court appears to draw, *ante*, at 423–424—between a deceptive misstatement and the concealment by the police of the critical fact that an attorney retained by the accused or his family has offered assistance, either by telephone or in person.[38]

Thus, the Court's truncated analysis, which relies in part on a distinction between deception accomplished by means of an omission of a critically important fact and deception by means of a misleading statement, is simply untenable. If, as the Court asserts, "the analysis is at an end" as soon as the suspect is provided with enough information to have the *capacity* to understand and exercise his rights, I see no reason why the police should not be permitted to make the same kind of misstatements to the suspect that they are apparently allowed to make to his lawyer. *Miranda*, however, clearly

---

[38] The Court cites *Johnson* v. *Zerbst*, 304 U. S. 458 (1938), a case involving a claim that a defendant had waived his right to trial counsel. I find it inconceivable that, in such a situation, an otherwise sufficient series of questions and answers can support a valid waiver if the government misinforms an attorney about the defendant's trial date, and if the government fails to tell the defendant of the attorney's communications. Yet that would be the consequence of the Court's "what the suspect doesn't know can't hurt him" approach to this case.

establishes that both kinds of deception vitiate the suspect's waiver of his right to counsel.[39]

As the Court notes, the question is whether the deceptive police conduct "deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Ante*, at 424. This question has been resoundingly answered time and time again by the state courts that, with rare exceptions,[40] have correctly understood the meaning of the *Miranda* opinion.[41] The ma-

---

[39] It is thus clear that the majority's comparison of a suspect in Burbine's position with "the same defendant . . . had a lawyer not telephoned the police station," *ante*, at 422, sets up a false comparison. For *Miranda*'s condemnation of trickery and cajolery requires that an assessment of police conduct figure importantly in the assessment of a suspect's decision to waive his fundamental constitutional rights. In the majority's comparison, however, the police conduct is irrelevant. In contrast, the appropriate comparison is between a suspect in Burbine's position and a suspect who is otherwise tricked and deceived into a waiver of his rights. *Miranda* itself, as well as the long-established presumption against the waiver of constitutional rights, requires that both kinds of waiver be held invalid.

[40] See n. 10, *supra*. Aside from this case, the only two exceptions were decided in 1985. Those recent cases may reflect a recognition that this Court is increasingly less than faithful to *Miranda*'s clear teachings. See, *e. g.*, *New York* v. *Quarles*, 467 U. S. 649 (1984); *Oregon* v. *Elstad*, 470 U. S. 298 (1985). Cf. *New York* v. *Quarles*, 467 U. S., at 660 (O'CONNOR, J., dissenting in part) (*"Miranda* is now the law and, in my view, the Court has not provided sufficient justification for departing from it or for blurring its now clear strictures").

[41] See *Lodowski* v. *State*, 302 Md. 691, 721, 490 A. 2d 1228, 1243 (1985) ("We have stated our view that a suspect must be fully informed of the actual presence and availability of counsel who seeks to confer with him, in order that any waiver of a right to counsel, as established by *Miranda*, can be knowing and intelligent"); *Haliburton* v. *Florida*, 476 So. 2d, at 194 ("In order for the right to counsel to be meaningful, a defendant must be told when an attorney who has been retained on his behalf is trying to advise him"); *Lewis* v. *State*, 695 P. 2d, at 529 ("The dispositive issue on this appeal is . . . whether a defendant's waiver of his rights to counsel and against self-incrimination is knowingly and intelligently made when the defendant is not informed of his attorney's availability at police headquarters. We hold today that such a waiver is constitutionally invalid"); *Common-*

jority's blithe assertion of "no doubt" about the outcome of this case, *ante*, at 421, simply ignores the prevailing view of the state courts that have considered this issue. Particularly in an opinion that relies on a desire to avoid "a federal intrusion into the criminal processes of the States," *ante*, at 434, one would expect at least some indication why, in the majority's view, so many state courts have been so profoundly wrong on this precise issue. Unlike the majority, the state courts have realized that attorney communication to the police

---

*wealth* v. *Sherman*, 389 Mass. 287, 296, 450 N. E. 2d 566, 571 (1983) ("[W]e conclude that the statement of the defendant must be suppressed because, under principles of construction of Miranda, the failure of the police to inform the defendant of the attorney's request [to see him] vitiated the defendant's waiver of his Miranda rights"); *Weber* v. *State*, 457 A. 2d 674, 685 (Del. 1983) ("When a suspect does not know that an attorney, who has been retained or properly designated to represent him, is actually present in the police station seeking an opportunity to render legal assistance, and the police do not inform him of that fact, there can be no intelligent and knowing waiver"); *People* v. *Smith*, 93 Ill. 2d, at 189, 442 N. E. 2d, at 1329 ("We hold that when police, prior to or during custodial interrogation, refuse an attorney appointed or retained to assist a suspect access to the suspect, there can be no knowing waiver of the right to counsel if the suspect has not been informed that the attorney was present and seeking to consult with him"); *State* v. *Haynes*, 288 Ore., at 70, 602 P. 2d, at 277 ("We hold only that when unknown to the person in this situation an identified attorney is actually available and seeking an opportunity to consult with him, and the police do not inform him of that fact, any statement or the fruits of any statement obtained after the police themselves know of the attorney's efforts to reach the arrested person cannot be rendered admissible on the theory that the person knowingly and intelligently waived counsel").

As noted, two state courts besides the Rhode Island Supreme Court have reached a contrary conclusion. See *State* v. *Beck*, 687 S. W. 2d 155, 159 (Mo. 1985) ("In light of the careful attention the deputies gave to insuring that defendant was properly informed of his *Miranda* rights, his unequivocal responses and determined conduct, evince nothing less than a deliberate, firm, knowing, and intelligent choice to speak without the prior counsel of Ms. Hendrix or any other attorney"); *Blanks* v. *State*, 254 Ga. 420, 423, 330 S. E. 2d 575, 579 (1985) ("In this case, Blanks was advised of his right to legal assistance on numerous occasions. The record shows overwhelmingly that he knowingly, intelligently, and voluntarily waived this right and spoke willingly to law enforcement officers").

about the client is an event that has a direct "bearing" on the knowing and intelligent waiver of constitutional rights. As the Oregon Supreme Court has explained: "To pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an identified attorney actually available to provide at least initial assistance and advice, whatever might be arranged in the long run. A suspect indifferent to the first offer may well react quite differently to the second." *State* v. *Haynes*, 288 Ore. 59, 72, 602 P. 2d 272, 278 (1979), cert. denied, 446 U. S. 945 (1980).[42]

In short, settled principles about construing waivers of constitutional rights and about the need for strict presumptions in custodial interrogations, as well as a plain reading of the *Miranda* opinion itself, overwhelmingly support the conclusion reached by almost every state court that has considered the matter—a suspect's waiver of his right to counsel is invalid if police refuse to inform the suspect of his counsel's communications.

### III

The Court makes the alternative argument that requiring police to inform a suspect of his attorney's communications to

---

[42] See also *People* v. *Smith*, 93 Ill. 2d, at 187, 442 N. E. 2d, at 1328–1329; *Commonwealth* v. *Sherman*, 389 Mass., at 291, 450 N. E. 2d, at 568.

The majority mischaracterizes this dissent by stating that its "major premise" is that *"Miranda* requires the police to inform a suspect of any and all information that would be useful to a decision whether to remain silent or speak with the police." *Ante*, at 433, n. 4. The majority's response ignores the fact that the police action here is not simply a failure to provide "useful" information; rather, it is affirmative police interference in a communication between an attorney and a suspect. Moreover, the "information" intercepted by the police bears directly on the right to counsel that police are asking the suspect to waive. The "information" at issue is thus far different from information about "the nature and quality of the evidence," *Oregon* v. *Elstad*, 470 U. S., at 317, or about a grand jury witness' possible target status, *United States* v. *Washington*, 431 U. S. 181, 188–189 (1977).

and about him is not required because it would upset the careful "balance" of *Miranda*. Despite its earlier notion that the attorney's call is an "outside event" that has "no bearing" on a knowing and intelligent waiver, the majority does acknowledge that information of attorney Munson's call "would have been useful to respondent" and "might have affected his decision to confess." *Ante*, at 422.[48] Thus, a rule requiring the police to inform a suspect of an attorney's call would have two predictable effects. It would serve *"Miranda'*s goal of dispelling the compulsion inherent in custodial interrogation," *ante*, at 425, and it would disserve the goal of custodial interrogation because it would result in fewer confessions. By a process of balancing these two concerns, the Court finds the benefit to the individual outweighed by the "substantial cost to society's legitimate and substantial interest in securing admissions of guilt." *Ante*, at 427.

The Court's balancing approach is profoundly misguided. The cost of suppressing evidence of guilt will always make the value of a procedural safeguard appear "minimal," "marginal," or "incremental." Indeed, the value of any trial at all seems like a "procedural technicality" when balanced against the interest in administering prompt justice to a murderer or a rapist caught redhanded. The individual interest in procedural safeguards that minimize the risk of error is easily discounted when the fact of guilt appears certain beyond doubt.

What is the cost of requiring the police to inform a suspect of his attorney's call? It would decrease the likelihood that custodial interrogation will enable the police to obtain a confession. This is certainly a real cost, but it is the same cost that this Court has repeatedly found necessary to preserve

---

[48] In contrast, the theory of the Rhode Island Supreme Court's decision was that, as a matter of fact, knowledge of attorney Munson's call would not have affected Burbine's decision to confess. *State* v. *Burbine*, 451 A. 2d 22, 29 (1982).

the character of our free society and our rejection of an inquisitorial system. Three examples illustrate the point.

In *Escobedo* v. *Illinois*, 378 U. S. 478 (1964), we excluded a confession by a defendant who had not been permitted to consult with his lawyer, and whose lawyer had not been permitted to see him. We emphasized the "lesson of history" that our system of justice is not founded on a fear that a suspect will exercise his rights. "If the exercise of constitutional rights will thwart the effectiveness of a system of law enforcement, then there is something very wrong with that system." *Id.*, at 490. In *Miranda* v. *Arizona*, 384 U. S. 436 (1966), we similarly stressed this character of our system, despite its "cost," by unequivocally holding that an individual has an absolute right to refuse to respond to police interrogation and to have the assistance of counsel during any questioning.[44] Thus, as a matter of law, the assumed right of the police to interrogate a suspect is no right at all; at best, it is a mere privilege terminable at the will of the suspect. And, more recently in *Dunaway* v. *New York*, 442 U. S. 200 (1979), the Court corrected the long-held but mistaken view of the police that they have some sort of right to take any sus-

---

[44] After endorsing the statement by "one of our country's distinguished jurists" that the quality of a nation's civilization can be largely measured by the methods it uses in the enforcement of its criminal law, the Court wrote:

"If the individual desires to exercise his privilege, he has the right to do so. This is not for the authorities to decide. An attorney may advise his client not to talk to police until he has had an opportunity to investigate the case, or he may wish to be present with his client during any police questioning. In doing so, an attorney is merely exercising the good professional judgment he has been taught. This is not cause for considering the attorney a menace to law enforcement. He is merely carrying out what he is sworn to do under his oath—to protect to the extent of his ability the rights of his client. In fulfilling this responsibility the attorney plays a vital role in the administration of criminal justice under our Constitution." *Miranda* v. *Arizona*, 384 U. S., at 480–481.

pect into custody for the purpose of questioning him even though they may not have probable cause to arrest.[45]

Just as the "cost" does not justify taking a suspect into custody or interrogating him without giving him warnings simply because police desire to question him, so too the "cost" does not justify permitting police to withhold from a suspect knowledge of an attorney's communication, even though that communication would have an unquestionable effect on the suspect's exercise of his rights. The "cost" that concerns the Court amounts to nothing more than an acknowledgment that the law enforcement interest in obtaining convictions suffers whenever a suspect exercises the rights that are afforded by our system of criminal justice. In other words, it is the fear that an individual may exercise his rights that tips the scales of justice for the Court today. The principle that ours is an accusatorial, not an inquisitorial, system, however, has repeatedly led the Court to reject that fear as a valid reason for inhibiting the invocation of rights.

If the Court's cost-benefit analysis were sound, it would justify a repudiation of the right to a warning about counsel itself. There is only a difference in degree between a presumption that advice about the immediate availability of a lawyer would not affect the voluntariness of a decision to confess, and a presumption that every citizen knows that he has a right to remain silent and therefore no warnings of any kind are needed. In either case, the withholding of information serves precisely the same law enforcement interests. And in both cases, the cost can be described as nothing more than

---

[45] A recent treatise describes the significant effect of *Dunaway:*
. "Over the years, the impression generally prevailed that the police could 'pick-up' suspects for questioning. In 1979, however, the Supreme Court of the United States held, in *Dunaway* v. *New York*, that a confession obtained after a 'pick-up' without probable cause (i. e., without reasonable grounds) to make an actual arrest could not be used as evidence." F. Inbau, J. Reid, & J. Buckley, Criminal Interrogation and Confessions 211 (3d ed. 1986).

an incremental increase in the risk that an individual will make an unintelligent waiver of his rights.

In cases like *Escobedo, Miranda*, and *Dunaway*, the Court has viewed the balance from a much broader perspective. In all these cases—indeed, whenever the distinction between an inquisitorial and an accusatorial system of justice is implicated—the law enforcement interest served by incommunicado interrogation has been weighed against the interest in individual liberty that is threatened by such practices. The balance has never been struck by an evaluation of empirical data of the kind submitted to legislative decisionmakers—indeed, the Court relies on no such data today. Rather, the Court has evaluated the quality of the conflicting rights and interests. In the past, that kind of balancing process has led to the conclusion that the police have *no right* to compel an individual to respond to custodial interrogation, and that the interest in liberty that is threatened by incommunicado interrogation is so precious that special procedures must be followed to protect it. The Court's contrary conclusion today can only be explained by its failure to appreciate the value of the liberty that an accusatorial system seeks to protect.

## IV

The Court also argues that a rule requiring the police to inform a suspect of an attorney's efforts to reach him would have an additional cost: it would undermine the "clarity" of the rule of the *Miranda* case. *Ante*, at 425–426. This argument is not supported by any reference to the experience in the States that have adopted such a rule. The Court merely professes concern about its ability to answer three quite simple questions.[46]

---

[46] Thus, the Court asks itself:

(1) "To what extent should the police be held accountable for knowing that the accused has counsel?" *Ante*, at 425. The simple answer is that police should be held accountable to the extent that the attorney or the suspect informs the police of the representation.

Moreover, the Court's evaluation of the interest in "clarity" is rather one-sided. For a police officer with a printed card containing the exact text he is supposed to recite, perhaps the rule is clear. But the interest in clarity that the *Miranda* decision was intended to serve is not merely for the benefit of the police. Rather, the decision was also, and primarily, intended to provide adequate guidance to the person in custody who is being asked to waive the protections afforded by the Constitution.[47] Inevitably, the *Miranda* decision also serves the judicial interest in clarifying the inquiry

---

(2) "Is it enough that someone in the station house knows, or must the interrogating officer himself know of counsel's efforts to contact the suspect?" *Ibid.* Obviously, police should be held responsible for getting a message of this importance from one officer to another.

(3) "Do counsel's efforts to talk to the suspect concerning one criminal investigation trigger the obligation to inform the defendant before interrogation may proceed on a wholly separate matter?" *Ibid.* As the facts of this case forcefully demonstrate, the answer is "yes."

[47] Two examples will illustrate the one-sided character of the Court's conception of the clarity of the *Miranda* warnings. Although a suspect is told that a lawyer will be appointed if he "cannot afford one," he may have no way of determining whether his resources are adequate to pay an attorney; even Members of this Court cannot agree when a person is too poor to pay his own legal costs. See, *e. g., Pfeil* v. *Rogers*, 474 U. S. 812 (1985) (Court splits 5–4 on whether to grant petitioner leave to proceed *in forma pauperis*); *Barrett* v. *United States Customs Service*, 474 U. S. 812 (1985) (same). Similarly, although a suspect is entitled to rely on the implicit promise that his silence will not be used against him, *Wainwright* v. *Greenfield*, 474 U. S. 284 (1986); *Doyle* v. *Ohio*, 426 U. S. 610 (1976), it is by no means clear that every suspect will understand that promise; many may fear that silence or a request for counsel will be construed as an admission of guilt. Cf. *Griffin* v. *California*, 380 U. S. 609, 610–611 (1965) (prosecutor argued that defendant's silence was probative of his guilt); App. in *Michigan* v. *Jackson*, O. T. 1985, No. 84–1531, pp. 157–158 (police statement to suspect) ("I think you need a brick to hit you against a wall to realize that your in serious trouble here and that the only way that you have any hope is by us. I don't know what your gonna think, how if you want an attorney, I'll tell you what an attorney is gonna tell ya, an attorney is gonna tell ya don't talk to police. . . . But, the attorney doesn't go to jail, does he?").

into what actually transpired during a custodial interroga-
tion.[48]  Under the Court's conception of the interest in clar-
ity, however, the police would presumably prevail whenever
they could convince the trier of fact that a required ritual was
performed before the confession was obtained.

## V

At the time attorney Munson made her call to the Cranston
police station, she was acting as Burbine's attorney.  Under
ordinary principles of agency law the deliberate deception of
Munson was tantamount to deliberate deception of her cli-
ent.[49]  If an attorney makes a mistake in the course of her
representation of her client, the client must accept the conse-
quences of that mistake.[50]  It is equally clear that when an
attorney makes an inquiry on behalf of her client, the client is
entitled to a truthful answer.  Surely the client must have
the same remedy for a false representation to his lawyer that
he would have if he were acting *pro se* and had propounded
the question himself.

The majority brushes aside the police deception involved in
the misinformation of attorney Munson.  It is irrelevant to
the Fifth Amendment analysis, concludes the majority, be-
cause that right is personal; it is irrelevant to the Sixth

---

[48] Indeed, in contrast to the majority's remarks about clarity, the opera-
tion of the principle expressed by almost all the state courts would be far
clearer than the operation of the Court's contrary principle.  For it is
surely easier to administer a rule that applies to an external event, such as
an attorney's telephone call or a visit to the police station, than a rule that
requires an evaluation of the state of mind of a person undergoing custodial
interrogation.

[49] In contrast to the Court's opinion today, the Court in the past has had
no problems applying principles of agency to the invocation of constitu-
tional rights.  See *Brewer* v. *Williams*, 430 U. S., at 405 (the accused "had
effectively asserted his right to counsel by having secured attorneys at
both ends of the automobile trip, both of whom, *acting as his agents*, had
made clear to the police that no interrogation was to occur during the jour-
ney") (emphasis added).

[50] See, *e. g.*, *Engle* v. *Isaac*, 456 U. S. 107, 134 (1982).

Amendment analysis, continues the majority, because the Sixth Amendment does not apply until formal adversary proceedings have begun.

In my view, as a matter of law, the police deception of Munson was tantamount to deception of Burbine himself. It constituted a violation of Burbine's right to have an attorney present during the questioning that began shortly thereafter. The existence of that right is undisputed.[51] Whether the source of that right is the Sixth Amendment, the Fifth Amendment, or a combination of the two is of no special importance, for I do not understand the Court to deny the existence of the right.

The pertinent question is whether police deception of the attorney is utterly irrelevant to that right. In my judgment, it blinks at reality to suggest that misinformation which prevented the presence of an attorney has no bearing on the protection and effectuation of the right to counsel in custodial interrogation. The majority parses the role of attorney and suspect so narrowly that the deception of the attorney is of no

---

[51] See *Edwards* v. *Arizona*, 451 U. S., at 482 (*"Miranda* . . . declared that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation"); *Miranda*, 384 U. S. at 479. In his *Miranda* dissent, Justice Harlan correctly noted that the Court had held that a person in custody "has a right to have present an attorney during the questioning, and that if indigent he has a right to a lawyer without charge." *Id.*, at 504. The standard written waiver form used by the police in this case recited: "I have the right to the presence of an attorney prior to and during any questioning by the police."

In his argument for the United States as *amicus curiae*, the Solicitor General advanced the remarkable suggestion that *Miranda*'s requirement that an individual be told that he has a right to consult with counsel while in custody is "a sort of a white lie" that is "harmless" and "useful." Tr. of Oral Arg. 21. He contended that "police do not have to provide a lawyer if he asks for a lawyer. They need simply terminate the interrogation." *Ibid.* I find this view completely untenable, and I take it that the Court's opinion, in today's sanctioning of police deception, does not in any way accept the suggestion that this Court's required warnings are themselves a constitutionally compelled form of deception, or "white lie."

constitutional significance.  In other contexts, however, the Court does not hesitate to recognize an identity between the interest of attorney and accused.[52]  The character of the attorney-client relationship requires rejection of the Court's notion that the attorney is some entirely distinct, completely severable entity and that deception of the attorney is irrelevant to the right of counsel in custodial interrogation.[53]

---

[52] See, *e. g.*, *Strickland* v. *Washington*, 466 U. S. 668, 690 (1984) (when client challenges effectiveness of assistance, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment"); *Wainwright* v. *Sykes*, 433 U. S. 72, 91, n. 14 (1977) ("[D]ecisions of counsel relating to trial strategy, even when made without the consultation of the defendant, would bar direct federal review of claims thereby forgone, except where 'the circumstances are exceptional' ").

[53] Prevailing norms of legal practice prevent a lawyer from communicating with a party, rather than a lawyer.  See Disciplinary Rule 7–104(A)(1), ABA Code of Professional Responsibility (1980) ("During the course of his representation of a client a lawyer shall not: Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so").  Cf. *United States* v. *Foley*, 735 F. 2d 45, 48 (CA2 1984) (prosecutorial practice of interviewing defendants in the absence of counsel before arraignment "raises serious constitutional questions" and "contravene[s]" the principles of DR7–104(A)(1)), cert. denied *sub nom. Edler* v. *United States*, 469 U. S. 1161 (1985); *State* v. *Yatman*, 320 So. 2d 401, 403 (Fla. App. 1975) ("Disciplinary Rule 7–104 of the Code of Professional Responsibility applies equally to lawyers involved in the prosecution of criminal cases as in civil cases. . . . If any communication with a person represented by counsel on the subject under litigation is prohibited, then taking the deposition of an individual charged with a criminal offense without notice to his counsel regarding matters which are relevant to the criminal charges pending against said represented individual is also clearly prohibited by the foregoing disciplinary rule"); *United States* v. *Springer*, 460 F. 2d 1344, 1354–1355 (CA7 1972) (Stevens, J., dissenting) (interview of defendant in absence of counsel would have violated DR7–104(A) in civil context and violated "procedural regularity" required by Due Process Clause in criminal context).  These cases suggest the established legal principle that an attorney and his client frequently share a common identity for purposes related to the client's legal interests.

The possible reach of the Court's opinion is stunning. For the majority seems to suggest that police may deny counsel all access to a client who is being held. At least since *Escobedo* v. *Illinois,* it has been widely accepted that police may not simply deny attorneys access to their clients who are in custody. This view has survived the recasting of *Escobedo* from a Sixth Amendment to a Fifth Amendment case that the majority finds so critically important. That this prevailing view is shared *by the police* can be seen in the state-court opinions detailing various forms of police deception of attorneys.[54] For, if there were no obligation to give attorneys access, there would be no need to take elaborate steps to avoid access, such as shuttling the suspect to a different location,[55] or taking the lawyer to different locations;[56] police could simply refuse to allow the attorneys to see the suspects. But the law enforcement profession has apparently believed, quite rightly in my view, that denying lawyers access to their clients is impermissible. The Court today seems to assume that this view was error—that, from the federal constitutional perspective, the lawyer's access is, as a question from the Court put it in oral argument, merely "a matter of prosecutorial grace." Tr. of Oral Arg. 32. Certainly, nothing in the Court's Fifth and Sixth Amendment analysis acknowledges that there is *any* federal constitutional bar to an absolute denial of lawyer access to a suspect who is in police custody.

In sharp contrast to the majority, I firmly believe that the right to counsel at custodial interrogation is infringed by police treatment of an attorney that prevents or impedes the attorney's representation of the suspect at that interrogation.

---

[54] See n. 10, *supra.*

[55] *State* v. *Haynes,* 288 Ore. 59, 602 P. 2d 272 (1979), cert. denied, 446 U. S. 945 (1980).

[56] *Lewis* v. *State,* 695 P. 2d 528 (Okla. Crim. App. 1984).

## VI

The Court devotes precisely five sentences to its conclusion that the police interference in the attorney's representation of Burbine did not violate the Due Process Clause. In the majority's view, the due process analysis is a simple "shock the conscience" test. Finding its conscience troubled,[57] but not shocked, the majority rejects the due process challenge.

In a variety of circumstances, however, the Court has given a more thoughtful consideration to the requirements of due process. For instance, we have concluded that use of a suspect's post-*Miranda* warnings silence against him violates the due process requirement of fundamental fairness because such use breaches an implicit promise that "silence will carry no penalty."[58] Similarly, we have concluded that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment."[59] We have also concluded that vindictive prosecution violates due process;[60] so too does vindictive sentencing.[61] Indeed, we have emphasized that analysis of the "voluntariness" of a confession is frequently a "convenient shorthand" for reviewing objectionable police methods under the rubric of the due process requirement of fundamental fairness.[62] What emerges from

---

[57] See *ante*, at 424 ("[W]e share respondent's distaste for the deliberate misleading of an officer of the court").

[58] See *Wainwright* v. *Greenfield*, 474 U. S., at 295; *Doyle* v. *Ohio*, 426 U. S., at 618.

[59] *Brady* v. *Maryland*, 373 U. S. 83, 87 (1963). See also *United States* v. *Bagley*, 473 U. S. 667 (1985); *United States* v. *Agurs*, 427 U. S. 97 (1976); *Moore* v. *Illinois*, 408 U. S. 786 (1972).

[60] *Blackledge* v. *Perry*, 417 U. S. 21 (1974).

[61] *North Carolina* v. *Pearce*, 395 U. S. 711 (1969).

[62] "This Court has long held that certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment. *Brown* v. *Mississippi*, 297 U. S. 278 (1936), was the wellspring of this no-

these cases is not the majority's simple "shock the conscience" test, but the principle that due process requires fairness, integrity, and honor in the operation of the criminal justice system, and in its treatment of the citizen's cardinal constitutional protections.

In my judgment, police interference in the attorney-client relationship is the type of governmental misconduct on a matter of central importance to the administration of justice that the Due Process Clause prohibits. Just as the police cannot impliedly promise a suspect that his silence will not be used against him and then proceed to break that promise, so too police cannot tell a suspect's attorney that they will not question the suspect and then proceed to question him. Just as the government cannot conceal from a suspect material and exculpatory evidence, so too the government cannot conceal from a suspect the material fact of his attorney's communication.

---

tion, now deeply embedded in our criminal law. Faced with statements extracted by beatings and other forms of physical and psychological torture, the Court held that confessions procured by means 'revolting to the sense of justice' could not be used to secure a conviction. *Id.*, at 286. On numerous subsequent occasions the Court has set aside convictions secured through the admission of an improperly obtained confession. . . . Although these decisions framed the legal inquiry in a variety of different ways, usually through the 'convenient shorthand' of asking whether the confession was 'involuntary,' *Blackburn* v. *Alabama,* 361 U. S. 199, 207 (1960), the Court's analysis has consistently been animated by the view that 'ours is an accusatorial and not an inquisitorial system,' *Rogers* v. *Richmond,* 365 U. S. 534, 541 (1961), and that, accordingly, tactics for eliciting inculpatory statements must fall within the broad constitutional boundaries imposed by the Fourteenth Amendment's guarantee of fundamental fairness. Indeed, even after holding that the Fifth Amendment privilege against compulsory self-incrimination applies in the context of custodial interrogations, . . . and is binding on the States, . . . the Court has continued to measure confessions against the requirements of due process. See, *e. g., Mincey* v. *Arizona, supra,* at 402; *Beecher* v. *Alabama,* 389 U. S. 35, 38 (1967) *(per curiam)." Miller* v. *Fenton,* 474 U. S. 104, 109–110 (1985).

Police interference with communications between an attorney and his client violates the due process requirement of fundamental fairness. Burbine's attorney was given completely false information about the lack of questioning; moreover, she was not told that her client would be questioned regarding a murder charge about which she was unaware. Burbine, in turn, was not told that his attorney had phoned and that she had been informed that he would not be questioned. Quite simply, the Rhode Island police effectively drove a wedge between an attorney and a suspect through misinformation and omissions.

The majority does not "question that on facts more egregious than those presented here police deception might rise to a level of a due process violation." *Ante,* at 432. In my view, the police deception disclosed by this record plainly does rise to that level.

## VII

This case turns on a proper appraisal of the role of the lawyer in our society. If a lawyer is seen as a nettlesome obstacle to the pursuit of wrongdoers — as in an inquisitorial society — then the Court's decision today makes a good deal of sense. If a lawyer is seen as an aid to the understanding and protection of constitutional rights — as in an accusatorial society — then today's decision makes no sense at all.

Like the conduct of the police in the Cranston station on the evening of June 29, 1977, the Court's opinion today serves the goal of insuring that the perpetrator of a vile crime is punished. Like the police on that June night as well, however, the Court has trampled on well-established legal principles and flouted the spirit of our accusatorial system of justice.

I respectfully dissent.