IRVING, J.,
for the Court.
¶ 1. Patricia Anderson Wilhite was indicted by a Pontotoc County grand jury for the murder of Jerry W. Russell. Her trial on this charge ended in a mistrial. After a change of venue to Monroe County, she was put to trial a second time. The second trial ended in a conviction and sentence, as an habitual offender, to life imprisonment without the possibility of parole. Aggrieved, Wilhite perfected this appeal and sets forth the following assignments of error, which are taken verbatim from her brief:
ISSUE NUMBER ONE
The Court committed reversible error by admitting evidence of bad acts of the Defendant with reference to alleged actions of forgeries and embezzlement contrary to Rule 404b of the Mississippi Rules Evidence. Specifically the Court, over the objections of the Appellant admitted evidence of alleged forgery, alleged theft and alleged embezzlement for which unfair prejudice and confusion outweighed any relevance (of which there was none) as there was no admissible evidence concerning robbery in this case or motive for robbery in this case. The Appellant was not indicted for capital murder or murder in the commission of a robbery and there was absolutely no evidence of robbery or robbery as a motive for murder and there was no evidence of any property being taken.
ISSUE NUMBER TWO
That the Circuit Court erred in failing to give sua sponte, a required limiting instruction when it erroneously allowed in over objection testimony concerning forgeries, embezzlement and other financial issues that constituted misconduct of a criminal nature.
ISSUE NUMBER THREE
The Appellant’s rights under the Fifth Amendment and the Fourteenth Amendment of the United States Constitution and also under the Mississippi Constitution were violated by the introduction of written statements and an alleged oral statement where they were taken after coercive and repeated questioning over a period of three days when the Appellant had been deprived of her medications and when the Appellant was mislead concerning the fact that she had attorneys retained to represent her and that the interrogations went on for over three days and under the totality of all the circumstances and as a result of the State’s misconduct in misleading and outright lying to the Appellant and other actions by the government that the written statements should never been admitted into evidence and the alleged oral statement should never have been admitted into evidence.
ISSUE NUMBER FOUR
The Court erred in allowing the introduction of certain statements made to investigator Berthay after a polygraph examination in Jackson when the Defendant had clearly indicated on the waiver document that the statements would not be used against her without her consent during the trial and that was her understanding and therefore she did not knowingly voluntarily and intelligently waive her Constitutional rights at the time of the polygraph examination.
ISSUE NUMBER FIVE
The Circuit Court erred in failing to sequester the jury while the trial was in progress after the Court had entered a prior order which had not been modified *235 or changed that the jury would be sequestered during the entire trial.
ISSUE NUMBER SIX
The Circuit Judge erred in his instructions to the jury when they could not reach a verdict when he sent a note to the jury and underlined please in the statement and gave the jury incorrect statements and comments about their deliberations.
ISSUE NUMBER SEVEN
The Court when it violated its own order requiring sequestration of the jury did not issue and give proper and timely instructions to the jury pursuant to Rule 3.11.
ISSUE NUMBER EIGHT
The Circuit Court erred in failing to give circumstantial evidence instruction when the only basis for not giving one was the alleged oral statement which was made to the ousted Sheriff who had been convicted of wire tap fraud and another employee. Surprisingly, neither made any record of such statement by written documentation or recording. A circumstantial jury instruction should have been granted to the Appellant.
ISSUE NUMBER NINE
The Circuit Court unfairly limited the cross examination of the former Sheriff who had pled guilty to a misdemeanor wire tapping charge and had been removed from office when he opened the door to such examination when he testified about how well thought of he was in the community and furthermore that he did not have access to tape recording equipment. The Appellant was denied her Sixth Amendment rights to cross examination and her common law rights of cross-examination when the Sheriff himself opened the door to such questions by his own self-serving testimony and explanation.
ISSUE NUMBER TEN
The Circuit Court erred in sentencing the Appellant to life without parole when she had never been sentenced to a State correctional institution or Federal correctional Institution.
ISSUE NUMBER ELEVEN
The Appellant was effectively denied her right to effective assistance of Counsel of her choice as a result of the Court not continuing this case when her retained, experienced trial Counsel became ill and was unable to be ready for trial when the Court wished to try the case and also the Appellant was denied effective assistance of Counsel as a result of various actions and inaction’s and failures on the part of her trial Counsel.
Finding no reversible error, we affirm Wil-hite’s conviction and sentence.
Facts
¶ 2. Jerry Wayne Russell was shot to death July 18, 1995, in Pontotoc County. There were no eyewitnesses to the shooting. His body was found by a relative and the county sheriffs department was called. Following an investigation by state and county law enforcement officers, Wilhite was indicted for murder under the habitual offender statute. Specific facts relevant to the resolution of the issues herein will be discussed under those issues.
Analysis of Issues Presented

1. Rule 4-04-(b) evidence

¶ 3. During the course of the investigation of Russell’s murder, Wilhite, in one of her confessions, admitted: she was in financial difficulty, that she owed the sher *236 iffs department the sum of $1,000 to $2,000 for inmates she had working in her business, that she had gone through an inheritance and had become broke in the previous month and that she had written checks in the amount of $4,000 on her parent’s business account without their knowledge. It was the State’s theory of the case that robbery was the motive for the murder though there was no evidence that any money was taken. The victim had approximately $4,500 in his pockets when law enforcement officials arrived on the scene. There was, however, evidence of opportunity to take money from the victim. In fact, there was evidence from which an inference could be drawn that money may have been taken from a bowl which the victim kept in the refrigerator.
¶ 4. Wilhite contends that the trial court erred in allowing those portions of her confession concerning her financial condition, particularly that part relating to writing checks on her parents’ account without their knowledge. While that evidence could be the basis for a separate crime, particularly if pursued by her parents, it was not offered by the State for the purpose of proving Wilhite’s character in order to show that she acted in conformity therewith in the commission of the crime charged. It is well-settled law that evidence of other crimes, wrongs, or acts— though inadmissible to prove the character of the accused to show that he acted in conformity therewith — is admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. M.R.C.P., Rule 404; Burrell v. State, 727 So.2d 761 (Miss.App.1998). As stated, the State’s theory was that robbery was the motive for Russell’s murder and that Wilhite’s need for money provided motivation for her to commit the offense. Wilhite argues that she was not indicted for capital murder and that the State’s investigation did not show that any money was taken; therefore, Wil-hite argues, evidence of her destitute financial situation was inadmissible.
¶ 5. We first point out that Wilhite’s contention that no money was taken is simply that, her contention. The evidence is far from conclusive on this point. It is true there was evidence that Russell usually carried a large sum of money on him and that at the time he was discovered he had more than $4,000 in his pocket. It is also true that there was no proof of exactly how much money he had immediately prior to his murder. However, there was evidence that sometime prior to his murder, he had at least $10,000. As stated, there was evidence that Russell also may have kept money in a bowl that was found empty when his body was discovered. Furthermore, we agree with the State that a failure to accomplish the act giving rise to the motive does not prevent evidence of motive from being admitted under Rule 404(b). There is no such requirement in the rule.
¶ 6. The trial judge did the required 403 analysis after determining that the evidence was admissible to show motive. He concluded that the probative value was not outweighed by the prejudicial effect. We agree and conclude that the trial judge did not abuse his discretion in allowing this evidence. Accordingly, this assignment is without merit.
2. The failure to give a limiting instruction regarding the Rule Wk(b) evidence
¶ 7. Wilhite argues that because the trial court failed to give a limiting instruction to the jury regarding the 404(b) evidence discussed in the preceding assignment, her conviction must be reversed. We disagree. She is correct, however, in her contention that a limiting instruction *237 should have been given in that the Mississippi Supreme Court has held that a trial court’s decision to admit 404(b) evidence over a defendant’s objection entitles the defendant to a sua sponte 403 analysis and a limiting instruction informing the jury of the limited purpose for which the 404(b) evidence may be considered by them. See Smith v. State, 656 So.2d 95, 100 (Miss.1995).
¶8. In this case, when the trial judge decided to admit the 404(b) evidence, he advised defense counsel that he would give a limiting instruction if the defendant submitted one. The defense did not. Now the defense claims that it was prejudicial error for the trial court not to give the instruction on its own initiative. We agree it was error but disagree that it was prejudicial error. The 404(b) evidence that was admitted is so dissimilar to the crime charged that it could be said with little doubt that the jury could not have been misled by it. We therefore overrule this assignment of error. We, however, do caution trial judges that they have an obligation to strenuously adhere to the clear and unambiguous guidance given by our supreme court on this matter.

S. Wilhite’s confessions versus her constitutional rights as guaranteed by the Fifth, Sixth and Fourteenth Amendments

¶ 9. On the morning of July 18, 1995, Jerry Russell’s body was found lying face-up in a pool of blood on the floor of his mobile home in Pontotoc County. The initial call to law enforcement was made to the Pontotoc County Sheriffs Department. The Pontotoc County Sheriffs Department subsequently requested the assistance of the Criminal Investigation Bureau of the Mississippi Highway Patrol, and its investigator, Michael Berthay, arrived at the scene shortly after it had been secured by the sheriffs department.
¶ 10. No signs of forced entry were found and nothing appeared to have been taken from the home. Cash in the amount of $4,477 was found in the victim’s pants pockets. Later in the day after he had an opportunity to question several individuals, Berthay learned that Wilhite had recently been a frequent visitor to the victim’s home and had been seen at or near the victim’s residence that morning. Berthay and Sheriffs Deputy Fred Worslin went to Wilhite’s home. They found her next door at her family’s place of business. It was approximately 4:00 p.m. when they arrived.
¶ 11. At trial, Berthay testified that Wil-hite gave a statement after she was orally advised of her rights against self-incrimination. The contents of that statement were not repeated at the trial. She was then asked to go with Berthay and Worslin to the sheriffs department so that the investigators could take a more detailed statement.
¶ 12. At the sheriffs department, Wilhite signed a waiver of rights form at approximately 5:20 p.m. She gave an un-recorded statement at that time in which she stated the following:
She got up that morning at about 6:30 a.m. and went to Washington’s Grocery to get her usual morning Pepsi in a 16 ounce glass bottle, arriving in her truck at approximately 6:55 a.m. After purchasing the Pepsi she returned to the truck, where she sat and prepared a list of things that she wanted to get done that day. At approximately 7:20 she left the store and drove to a location directly across the road from the murder victim’s residence and took rose cuttings from bushes that were growing there. She gathered her rose cuttings and went *238 back home and then to breakfast at her mother and father’s home.
¶ 13. At approximately 9:19 p.m. on that same evening (July 18th), Wilhite executed a second rights waiver. Berthay testified that during the time between the statement given at 5:20 p.m. and the one given at 9:19 p.m., Wilhite agreed to travel with Berthay back to the location of the rose bushes where she took the cuttings and to her residence. At her residence, she showed him the clippers and gloves she used to do the cuttings as well as the cuttings themselves. Wilhite was then taken back to the sheriffs office where she gave the 9:19 p.m. statement.
¶ 14. Berthay testified that he took the 9:19 p.m. statement because he wanted to get a taped or formal statement on record of everything that Wilhite had done on the morning of July 18th. Even though this statement was said to have been taped, no tape was introduced at trial. Berthay testified that in that statement Wilhite stated the following:
She basically repeated her earlier statement but added a little more detail about certain things. She went into greater detail about her relationship with the victim and his role in helping her purchase a van for her floral business. She also told of having gone to visit the victim at his residence in the early morning hours of July 17th, the day before the murder, at which time she and the victim spoke about the van. The victim was in the used car business, and she needed a van to transport county inmates she used to work in her business. She also stated that some time prior to July 17th she had taken one of her tools to the victim for repair. She also detailed several trips to Washington’s Grocery Store on the 17th which took her past the victim’s residence.
¶ 15. The record shows that at approximately 9:53 p.m., while this statement was being taken, private attorney Jamie W. Howell, Jr. called the jail in Pontotoc and spoke with Sheriff Randy Roberts after he had been retained by Wilhite’s family members to represent her. Howell testified at the hearing on the motion to suppress that Roberts identified himself and that Howell did the same. Roberts immediately passed the phone to someone who identified himself as Mike Berthay, investigator for the highway patrol. Howell informed Berthay that Howell was a lawyer and had been asked by members of Wil-hite’s family to represent her and that he was calling on her behalf and wanted to speak with her.
¶ 16. Howell stated that Berthay questioned him regarding whether he had been called by Wilhite, to which Howell responded, “no,” but explained that Wilhite’s family had called and requested that he represent her. Howell quoted Berthay as saying, “I can’t let you talk to her right now, we’re in the middle of a statement.” Howell responded, “No, you know, I need to talk to her.” Berthay answered, “Well, she’s just going to have to call you back.” Howell said that he was then told by Ber-thay that Wilhite did not know anything about having a lawyer, to which Howell responded, “That’s why I’m calling to tell you that she’s got one, she may not know.” Howell then asked Berthay to have Wilhite call him as soon as she was able to call. Howell said that Wilhite never called. On cross-examination, Howell admitted that when he made the telephone call to the jail, he had not been hired to represent Wilhite but had been asked by Wilhite’s daughter’s flaneé to make the call. He also admitted that he did not tell Berthay not to question Wilhite.
¶ 17. Berthay testified that he took the initial phone call from Howell. It was his *239 testimony that he spoke with Howell while in the room where Wilhite was being questioned and in Wilhite’s presence and admits that he refused to allow Wilhite to speak with Howell. He did not give any indication that he informed Wilhite that Howell wanted Wilhite to phone him as soon as possible, nor did he give any indication that he made a telephone available to Wilhite so that she could call Howell if she wished. Berthay further testified that after the phone call ended he asked Wil-hite if she knew an attorney named Jamie Howell, and Wilhite responded that she did not, but thought that Howell was probably someone her family had contacted on her behalf, but that she did not wish to have an attorney at that time.
¶ 18. The next morning, July 19th, at approximately 8:00 a.m. Wilhite was taken to Jackson and administered a polygraph examination. Berthay testified that the drive to Jackson was a three to four hour drive, and when they arrived, Wilhite was given a lengthy pre-test interview which began at about noon to 12:80 p.m. Following the pre-test interview, Wilhite was hooked up to the polygraph machine from approximately 2:00 p.m. until 7:00 p.m. She was not brought back to the jail until 11:00 p.m.
¶ 19. Howell testified that early on the morning of July 19th he called jail officials to inform them that he would be coming to visit Wilhite later that day. Sometime after the call to the jail, he had a meeting with Wilhite’s parents in which a formal agreement was reached regarding his representation of her. Afterwards, he went to the jail to see Wilhite. When he arrived at the jail shortly after 2 p.m., he was informed that Wilhite was not at the jail. He later learned that she had been taken to Jackson and given a polygraph exam. Once again, Howell left his name and phone number with a request that Wilhite be asked to call him as soon as possible. Once again, the message was not passed on, and Wilhite never called.
¶20. Berthay testified that he took a statement from Wilhite on July 19th immediately after she had finished taking a polygraph exam. He stated that he did not advise her of her rights because she had already executed a written waiver given to her by the polygraph examiner, an employee with the Mississippi Highway Patrol. He explained that he saw no need to have Wilhite execute another waiver because the polygraph examiner worked for the Mississippi Highway Patrol just as he did and this was in fact a continuing interview. Before executing the waiver, Wilhite wrote on it that “these test results cannot be used in a court of law without my written consent.” Berthay testified that in this statement Wilhite altered some of the information she had given in previous statements. According to Berthay, she made the following admissions:
She admitted that she had not been truthful about the clothes that she was wearing on the day of the murder. She had originally stated that the clothes that she was wearing when she was initially questioned on the 18th were the same clothes that she had on in the early morning when she left the grocery store. In this statement, she admitted changing her clothing after she left the scene of the rose cutting. She also stated that when she exited her truck at the rose bushes across from the victim’s residence she heard at least one gunshot and attempted to cross the road but had to wait for two semi trailer trucks to go pass. She entered the victim’s residence and found Russell lying on the floor face-up in a pool of blood. She heard some type of wheezing or beeping noise and fled the scene. She stated that she was almost certain that she got *240 blood on her right knee from kneeling near the victim. She gave a detailed description of blood pouring from the victim’s mouth and of his head and chest being covered in blood. She stated that she changed clothes before going to her parents for breakfast.
She described having seen a boxy-looking type Galaxy car, light blue in color, sitting to the right or west of the victim’s trailer. She also reported seeing someone described as a white male, five ten to five eleven, late 20s to early 30s, with dark hair, leave the trailer in the car. She stated that this individual was someone she had seen on previous occasions at the grocery store.
She admitted that: she was in financial difficulty; she owed the sheriffs department money for the inmates she had working in her business in the sum of $1,500 to $2,000; she had gone through an inheritance and had become broke in the previous month; she admitted having written checks on her parent’s business account in the amount of approximately $4,000 without their knowledge. Wilhite agreed to produce the bloodstained clothes and agreed to sign a consent to search her house to retrieve the clothes on the night of the 19th. Clothing matching the clothes she was wearing on the grocery store video was retrieved and sent to the crime lab. No blood was found on the clothes. Ber-thay testified that she told him she had washed the clothes.
¶ 21. On July 20th, at approximately 9:03 a.m. another statement was taken. A waiver of rights form was executed and introduced as an exhibit at trial. An audio tape recording was made of this statement and was played at the trial. In this statement, Wilhite basically repeated the same things that Berthay testified that she told him in the unrecorded statement of July 19th, with the following additional statements:
Wilhite stated that after she heard the single gunshot and went to the victim’s residence, she knocked on the door and called out to him. She then opened the door to enter the mobile home and tripped on an overturned chair near the doorway, snagging her trousers in the process. She said that she started to kneel down beside the victim when the shrill, piercing sound of the victim’s pacemaker went off startling her and causing her to immediately rise back to a standing position probably without ever kneeling all the way to the floor. She said that she had some training as a nurse and knew that when the pacemaker sounded that meant that the victim’s heart had stopped and that he was dead. She said that she ran out of the trailer and it was then that she noticed the “boxy-looking” car parked at the residence and realized that the shooter was still in the residence. She stated that she had seen the person who she thought to be the owner of that car driving the victim’s car the previous week and that the victim was in the passenger seat. She said that she ran back to her truck and drove home feeling very guilty because she didn’t do anything to try to help the victim when she might have been able to use her nurse training to help him and also because she did not contact the victim’s family and tell them what she had found. When specifically questioned about whether she washed the pants that she was wearing when she went into the victim’s residence she denied having done so, even while stating that she thought that she must have gotten blood on them. She also denied having shot the victim.
*241 ¶ 22. At the point on the tape where Berthay is heard to say that the statement was at an end, the tape recorder was turned off. The evidence at trial was that shortly thereafter all of the law enforcement officers present during the taping, Sheriff Randy Roberts, Deputy Fred Worslin, Mississippi Highway Patrol investigators Michael Berthay and Mickey Baker, and Perry Sewell, an investigator with the district attorney’s office, exited the room, leaving Wilhite alone. Sewell testified that he went back into the room alone to sit with Wilhite for a while. He stated that they began to have a conversation in which Wilhite questioned him about what criminal charges might be brought against an individual that committed certain crimes, and he attempted to explain. He said that Wilhite made a statement that, in effect, bemoaned the fact that her parents were going to be very disappointed in her. It was at that point that Sewell said he asked Wilhite if she shot Russell, and that Wilhite said, “yes” she did. He said that he asked the whereabouts of the weapon and she told him what she did with it.[1] Sewell said he then left the room to inform the other officers of what he had just heard.
¶23. Sewell conceded that, up to this point in the investigation, this was the only time that Wilhite had ever admitted shooting Russell. He also conceded that she never repeated this admission on tape, that she never signed any written statement confirming this admission or any other written statement admitting guilt, and that she was never asked to do so by anyone in law enforcement. This conversation between Sewell and Wilhite was said to have occurred at or near the lunch hour.
¶ 24. Sheriff Randy Roberts testified that at approximately two o’clock in the afternoon that same day, he had a private conversation with Wilhite in which she admitted to the shooting.[2] Roberts testified that before speaking with Wilhite he obtained a signed waiver of rights form. The following is Roberts’s written report of the interview:
On 07-20-95 at approx. 2:30 p.m., Patricia Wilhite was questioned by Sheriff Roberts regarding the murder of Mr. Jerry Russell. Sheriff Roberts and Ms Wilhite talked for approximately 20 to 30 minutes about each others. families. After this conversation, Ms Wilhite stated she was across the road, at Jerry Russell’s trailer, cutting roses. She stated she saw a blue car by the fence at the water well (inside the gate). She stated she heard several gun shots that apparently came from Jerry’s trailer. She continued to cut roses. She looked up and saw a man running towards her, to his car. (She was beside the car cutting roses). The man got into his car and went east on Redland-Serepta road. At that time, she walked to her truck, took off her gloves, and laid them on the back of her pick-up. She hurried across the road to Jerry’s trailer. She stated she knocked on his door, but could not get an answer. She could hear the T.V. playing. She stated she finally got the door opened, went in and tripped over his body. When she tripped she noticed a gun laying beside him. She stated he was suffering and his mouth was moving. She stated she bent over him and *242 shot him once, in the head — to put him out of his misery. She stated she heard a high pitched sound, she thought was a pace maker. She stated she ran out of the door, got in her truck and left. Ms Wilhite stated she was tired and wanted to lay down. This concluded the interview with Ms Patricia Wilhite.
¶ 25. Roberts further testified that near the end of his interview with Wilhite, she told him that she had three questions that she wanted to ask a lawyer. He said that he immediately ceased questioning her and informed Berthay of Wilhite’s request. According to Berthay’s testimony, it was at this point that arrangements were made to have the public defender appointed to represent her.
¶ 26. Jim Johnstone, the Pontotoc County Public Defender, testified that on that same day (July 20th), shortly after lunch, he received a call to appear in justice court on behalf of Wilhite, whom he had just been appointed to represent. When he arrived at justice court Wilhite had already had an initial appearance where it had been determined that she was not able to hire an attorney. Johnstone testified that he was asked by law enforcement officers, specifically, Berthay, Sewell, and Roberts, if they could question Wilhite about the case. He told them that he wanted to speak with her first himself, having not had an opportunity to do so, and that he would then respond to their inquiry as circumstances dictated. After speaking with Wilhite, whose demeanor he described as follows:
Well, she was in a very — what I felt like was a disturbed mental state. She could give me kind of basic background information about her, but she appeared to have some kind of flight ideas, and that type of thing. She indicated to me that she had — she was under some medication and that she did not have her medication.
Johnstone went on to testify as follows:
And after my initial conversation with Ms. Wilhite, I immediately went to the law enforcement officers and told them that in my opinion I did not feel like that she should have any interview whatsoever at this time, you know, with the law enforcement.
¶27. Johnstone stated that at no time during his conversation with Wilhite did she ever mention or give any indication that she had private counsel or that her family had hired private counsel. He stated that shortly after he informed the law enforcement officers that Wilhite should not be asked to give any statements Wil-hite was transported back to jail. He said that he left the courthouse and spoke with members of Wilhite’s family and learned that they had retained counsel to represent her. He also spoke with Howell and learned of the difficulties that Howell and his co-counsel had encountered trying to make contact with Wilhite.
¶ 28. Later that evening he was able to meet with Wilhite at the jail. He said he tried to explain to her that her parents had hired very able attorneys to represent her and that she would be well represented and tried to assure her that the attorneys would be contacting her soon.
¶ 29. At the motion to suppress, Wilhite denied confessing to either Sewell or Roberts that she killed Russell. Wil-hite argues that the trial court committed reversible error in denying her motion to suppress and in admitting her statements into evidence when the statements were made at a time when she did not have the benefit of advice of counsel and when she was denied the right to an attorney. She also argues that the trial judge erred in admitting the statement given to Berthay *243 on July 19th because she had specifically written on the waiver form, which she executed prior to taking the polygraph examination, that the statements could not be used against her in court. The State counters that the findings of the lower court, in overruling Wilhite’s motion to suppress the statements, are overwhelmingly supported by the proof.
¶ 30. The lower court found as follows:
The Court further finds that on several occasions prior to interrogation by law enforcement officers, the Defendant was given her Miranda rights and that on each occasion (the 18th, 19th, and 20th of July 1995) she signed a waiver of her rights to an attorney. The Court finds from the proof that under a totality of the circumstances, the Defendant, Patricia Anderson Wilhite, was in fact, knowingly, understandingly, freely and voluntarily waive [sic] her Miranda rights, particularly the right to counsel. Accordingly, the Court finds the Defendant’s statements were freely and voluntarily made without any threats, force or coercion.
The Court further finds that events occurred outside the presence of the Defendant and entirely unknown to her surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right.
¶ 31. As to Wilhite’s contention that the statement she gave to Berthay immediately after the conclusion of the polygraph examination was inadmissible because it could not be deemed to have been knowingly and voluntarily given in light of the limitation she wrote on the statement, the trial judge found that the limitation went to the admissibility of the polygraph results, not the interrogation by Berthay at the conclusion of the polygraph examination.
¶ 32. We find that the lower court was correct in its findings as they relate to the statements made by Wilhite. The Mississippi Supreme Court has approvingly cited Moran v. Burbine, 475 U.S. 412, 422, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) for the proposition that, even though a lawyer had been retained by family members, it was of no consequence because the defendant was unaware of the efforts of the family or the lawyer. Hunt v. State, 687 So.2d 1154, 1160 (Miss.1996). The court addressed a similar situation in Lee v. State, 631 So.2d 824 (Miss.1994). There, the defendant’s sister made a statement to the effect that she was going to obtain a lawyer to represent the defendant. Id. at 826. Lee contended that the statements emanating from his sister were sufficient to trigger his right to counsel and preclude any subsequent waiver of his rights. Id. The Lee court began by noting that under Moran “attempts by others to procure counsel are not sufficient to invoke the Fifth Amendment right to counsel where the defendant is unaware of such attempts.” Id. We are not aware of any law that requires law enforcement personnel to cease with a lawful interview and re-advise the defendant that he has the right to a lawyer or inform him that there is a lawyer outside, where the defendant himself has not requested or otherwise indicated that he wished to speak with an attorney before further questioning. Therefore, we affirm the lower court’s ruling that under a totality of the circumstances, Wilhite knowingly, understandingly, freely and voluntarily waived her Miranda rights, particularly the right to counsel, and those statements were admissible. While it certainly would have been permissible, and perhaps desirable, for the law enforcement officials to inform Wilhite that her parents were in the process of hiring an attorney for her and that an attorney had called to speak *244 with her, they were not under a legal obligation to do so.
¶33. We also find that the trial judge correctly construed the limitation placed on the waiver by Wilhite. Therefore, we also affirm his ruling of no violation as to the admissibility of the statement given to Berthay immediately following the polygraph examination.
¶ 34. Wilhite claims the State failed to comply with Agee v. State, 185 So.2d 671 (Miss.1966) by failing to present on the suppression hearing all law enforcement officials present when she gave her confessions. While Wilhite argues on appeal that her Fifth Amendment rights were violated, we agree with the State that the issue pressed below by Wilhite was that her several statements were taken in violation of her Sixth Amendment right to counsel. The thrust of her motion to suppress was that she was denied access to counsel, and as a result, her statements, elicited without counsel, could not be used against her. She made no allegation that her statements could not be used against her because they were the products of threats or offers of reward or that what was alleged to be said by her was not in fact said. In other words, she made no factual claim that placed her claim within the clutches of Agee. The trial judge thoroughly considered the issue before him in the factual context presented. He was never asked during the hearing on the motion to suppress to rule on whether threats of violence or unlawful inducements brought about the confessions. Rather, the contention was that law enforcement officials improperly kept Wilhite in the dark concerning her parents’ effort to hire an attorney for her and refused to assist the attorney in communicating to Wilhite her parent’s efforts in that regard. This, Wilhite contended, made her confessions illegal because they were taken by deception under circumstances denying her the right to counsel and due process of law. Indeed, there is no evidence in the record which would indicate that Wilhite’s confessions were the result of violence, threats of violence or improper inducements.
¶ 35. Wilhite did allege in memo-randa in support of her motion to suppress, during argument on the motion and in her motion for a new trial, that law enforcement officials induced her to give a statement on July 18th by telling her, when she requested counsel, that a public defender was not available because he had five counties to cover and that if she answered their questions they would take her home. She also alleged that during the periods of interrogation she was denied her prescription medication for her mental impairments and this denial amounted to coercing her confessions. None of these allegations were made in the motion to suppress though they were placed before the trial judge via Wilhite’s testimony on the motion to suppress and as stated, during argument on the motion to suppress and via memoranda in support of the motion to suppress. After hearing all of the relevant testimony on these points — including the expert testimony of Dr. Criss Lott that in his opinion Wilhite was not suffering from any debilitating condition that could affect her ability to knowingly, intelligently and voluntarily execute a waiver of her rights — the trial judge concluded that she knowingly and voluntarily waived her right to counsel. We cannot say that the trial judge abused his discretion in so doing.
A The failure to sequester the jury and give proper instructions pursuant to Rule 8.11 of the Uniform Rules of Circuit and County Court
¶ 36. Prior to the first trial of this case in Pontotoc County, the trial court *245 granted a defense motion to sequester the jury. A mistrial was declared in the first trial, and on retrial the case was removed to Monroe County. At the beginning of the second trial, the court advised the jurors that they would not be sequestered. No objection was made by the defense. The defense has shown no prejudice whatsoever by the failure of the court to sequester the jury. We have reviewed Wilhite’s argument regarding the alleged failure of the trial judge to instruct the jury during recesses when the jury has not been sequestered. There was only one recess in the trial. The record reveals that the trial court did not instruct the jury on each item enumerated in Rule 3.11 though it did instruct as to some. The defense offered no evidence as to how it was prejudiced by the court’s failure to literally instruct as to each item mentioned in the rule. Consequently, we find this assignment of error to be utterly without merit.
5. Instructions given to the jury in response to notes from it regarding its inability to reach a verdict
¶ 37. The jury received the case for deliberation at 10:55 a.m. At approximately 4:25 p.m., the jury was returned to the courtroom and the following transpired:
THE COURT: I have received the second message from you indicating that you have not had any success up to this particular point in reaching a verdict. I want to ask you a question, and all I want is two numbers. I don’t want to know whether it’s guilty or not guilty. I just want a numerical division as of your last vote, if any, that was taken, whether it be 9-3, 6-6, 7-5, 8-4,11-1,10-2, whatever. I just want those two numbers. Can you give me that?
JUROR: 11-1.
THE COURT: All right. Okay. I realize you feel that you have been back there a long time. You’ve been back there five and a half hours. You spent some time eating and I’m sure you maybe deliberated during that time. But for a five-day case, you really haven’t been back there that long, or four days of testimony, three days of testimony and one day of selection. You’ve spent, roughly, something less than two hours per day on the testimony.
I’m going to let you continue to deliberate. You’re relatively close. A lot closer than a lot of juries that we see. Don’t feel that you have got to change your vote merely because I’m sending you back there. You have an instruction that I gave you earlier concerning reexamining your views and changing your opinion, if convinced its [sic] erroneous. Reread that instruction. It’s a Court’s instruction. I don’t recall the number of it, but reread that one. It’s the one that tells you — gives you — informs you that all twelve of you must agree in order to return a verdict and it also states that if you cannot, you can report that to the Court, as you have done.
I want you to continue to deliberate. You’re not far from a verdict. You may stay there; you may go the other way. That’s strictly left up to you. I want you to spend some more time considering this matter and, accordingly, I’m going to let you go back to the jury room at this time to continue your deliberations. You may be excused. Please go back to the jury room, (emphasis added).
¶ 38. The instruction to which the court made reference reads as follows in pertinent part:
It is your duty as jurors to consult with one another and to deliberate in view of reaching an agreement if you can do so *246 without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous, but do not surrender your honest convictions as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.
¶ 39. The record reflects that at 9:55 p.m., the following occurred:
THE COURT: Have you made any progress, ladies and gentlemen? JURORS: No, sir.
THE COURT: Have not. I’m sure all of you are probably wondering what part of “no” I don’t understand based on the several notes that you have sent me. We have been here for five full days and this case has been tried well and tried hard by both sides. We are going to recess for tonight. I want you to report back in the morning at 9 o’clock. 9 o’clock to the jury room. Do not start deliberating until all twelve of you are present. At that time, please commence your deliberations when all are present in the jury room.
Don’t discuss the case between now and then with anyone or allow anyone to discuss it with you or in your presence. Don’t view any media account whatsoever of this particular trial. Please conduct yourself in the manner that you have up to this particular point.
Anyone have any problems reporting back tomorrow morning at 9? Okay. Yes sir?
JUROR LUSK: How much longer tomorrow? I have got to be in Tennessee. I was supposed to leave this evening.
THE COURT: I don’t know exactly. I’ll do my best to accommodate you. However, let’s see how we progress tomorrow.
JUROR LUSK: Could it go into Sunday or what?
THE COURT: No, sir. No, sir.
JUROR LUSK: All right, sir. Thank you, sir.
¶ 40. The next morning around 9 o’clock the jury continued its deliberation and returned its verdict around 10:00 a.m.
¶ 41. The colloquies above were apparently prompted by two notes found in the record. No time was written on the notes but one note reads, ‘We are unable to reach a unanimous verdict of guilty or not guilty.” On this note, the trial judge wrote the following, “Please continue to deliberate.” The second note reads:
We the jury are unable to come to a verdict other than 11 to 1. The eleven will not change their minds as to the verdict and the one will not change his or her mind as to the verdict. Therefore we feel we are a hung jury.”
On this note, the trial judge wrote the following, “Please continue to deliberate.” (emphasis in the original).
¶ 42. Wilhite contends the trial judge’s statements and instructions to the jury coerced the guilty verdict. We first point out as does the State that no objection was made at trial to the trial judge’s handling of this matter. Also, the defense did not make a motion for a mistral; therefore, the issue is procedurally barred. Secondly, even if the issue were not procedurally barred, Wilhite’s contention on this point is without merit. We agree with the State that no coercion occurred, and the trial judge’s handling of this matter was well within the parameters of Sharplin v. *247 State, 330 So.2d 591, 596 (Miss.1976). This issue is without merit.

6. The failure to give a circumstantial evidence instruction

¶ 43. Wilhite contends she was entitled to a circumstantial evidence instruction because all of the evidence that was offered against her was circumstantial except for her confessions to Sheriff Roberts and Investigator Sewell. She argues that the confessions should be discounted because they were not recorded. This issue is totally without merit. A circumstantial evidence instruction is required only when the prosecution’s case is grounded entirely upon circumstantial evidence. Petti v. State, 666 So.2d 754, 757 (Miss.1995). A confession by the defendant removes the case from the circumstantial evidence realm. Gray v. State, 728 So.2d 36, 76 (Miss.1998).

7. Life sentence without parole

¶ 44. Wilhite argues that she was improperly sentenced to life without parole because the State failed to prove that she had been convicted twice previously of a felony within the meaning of section 99-19-81 of the Mississippi Code of 1972, as amended. Specifically, she argues that the State failed to prove that she had been previously sentenced to a state or federal penal institution.
¶ 45. At trial, after reviewing the State’s evidence in support of sentencing Wilhite as a habitual offender, the trial court ruled:
Based on the documents contained in State’s Exhibit 37, the Court finds that Patricia Anderson Wilhite has been convicted six times previously of felony charges upon charges separately brought and arising out of separate incidents at different times and that she has been sentenced to separate terms of one year or more in a state penal institution and that she qualified to be sentenced under the provisions of Mississippi Code Section 99-19-81.
A review of the record leaves no doubt that Wilhite had been convicted in the state of Tennessee of separate felonies brought and arising out of separate incidents at different times and that she had been sentenced to separate terms of one year or more. Apparently, Wilhite contends that because she was sentenced to serve less than her full sentence and the time was served in a “workhouse,” she does not qualify for sentencing as a habitual offender.
¶ 46. We first note that Wilhite offered no authority to support her contention that the “workhouse” in Tennessee is not a state penal institution. Wilhite says all of her time was served in the Shelby County Penal Farm. For purposes of the statute, where she served the time is irrelevant. What is relevant is the institution to which she was sentenced. That institution was the “workhouse.” The trial court found that Wilhite had been sentenced to a state penal institution. We decline to hold the trial judge in error on these facts.

8.Ineffective assistance of counsel

¶ 47. Wilhite claims she was denied effective assistance of counsel. She contends the refusal of the trial court to grant a continuance after her retained counsel became ill deprived her of the counsel of her choice and forced her to go to trial with less experienced counsel. This contention lacks any merit, for the record reveals Wilhite did not request another continuance after having received two continuances because of retained counsel’s illness. Instead, on the morning of the trial, she announced “ready” when her case was called.
*248 ¶ 48. She also contends she received ineffective assistance of counsel because of the following failures by trial counsel:
1. Failure to make renewed motions for sequestration of the jury where the Court was failing to follow its own order.
2. Failing to object to the documents from the state of Tennessee and failing to clearly point out to the Court that these documents did not indicate and establish a sentence through a State or Federal prison and that the institution was only a county penal farm.
3. Failure to interrogate ex-Sheriff Randy Roberts concerning the details of his conviction for wire tap fraud when the State opened the door for such testimony.
4. Failing to make repeated motions for a continuance when Mr. Bob Gilder was unable to try the case and had not yet recovered from his illness when neither of the other attorneys had significant experience in trying murder cases.
5. Failing to ask witnesses pertinent questions.
6. Failure to be sure that the jury was given a limiting instruction after the bad acts testimony came in.
7. Failure to get rulings on all motions that were filed in the case and to get the ruling included in the record.
8. Failure by defense Counsel to require production of exculpatory evidence such as clothing that allegedly smelled like bleach, since Counsel never requested this evidence to be brought in.
9. Failure to respectfully demand and strenuously seek a cautionary and limiting instruction with respect to the forgery and misappropriation of funds evidence which the Court erred in allowing as stated in issue number one.
To establish ineffective assistance of counsel, a defendant must show both a deficiency in counsel’s performance and prejudice to his defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We hold that Wilhite has failed to carry her burden as to both requirements. Other than offering a recitation of the alleged deficiencies, she has not attempted to show how she was prejudiced by any of the alleged deficiencies. Mississippi recognizes a strong though rebuttable presumption that counsel’s conduct falls within the broad range of reasonable professional assistance. McQuarter v. State, 574 So.2d 685, 687 (Miss.1990). Wilhite has offered no argument or explanation sufficient to overcome the presumption or to persuade us that the outcome of her trial would have been different, but for these alleged deficiencies. Accordingly, this issue is without merit.
¶49. We have reviewed the remaining assignment of error by Wilhite concerning the limitation placed on her cross-examination of Sheriff Roberts and find that it is so devoid of merit that further discussion is not warranted.
¶ 50. THE JUDGMENT OF THE CIRCUIT COURT OF MONROE COUNTY ON CHANGE OF VENUE FROM PON-TOTOC COUNTY OF CONVICTION OF MURDER AND SENTENCE TO A TERM OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WHICH SENTENCE SHALL NOT BE REDUCED OR SUSPENDED, NOR SHALL THE APPELLANT BE ELIGIBLE FOR PAROLE OR PROBATION IS AFFIRMED. ALL COSTS ARE ASSESSED TO PONTOTOC COUNTY.
*249 McMILLIN, C.J., KING and SOUTHWICK, P.JJ., and LEE, J., concur.
THOMAS, J., concurs in part and dissents in part with separate written opinion joined by BRIDGES and PAYNE, JJ.
MOORE, J., not participating.

. No weapon has ever been recovered in this case.

. Unlike Sewell, Roberts obtained a waiver of rights prior to questioning Wilhite. Similarly as with Sewell, however, the admission was not tape recorded at the time that it was said to have occurred, and Wilhite was never asked to repeat the admission on tape or asked to sign a written statement incorporating the admissions.